DOROTHY ANN FINCH & others[1] vs. COMMONWEALTH HEALTH
INSURANCE CONNECTOR AUTHORITY & others.[2]

Suffolk. October 6, 2011. - January 5, 2012.

Present: IRELAND, C.J., SPINA, CORDY, GANTS, DUFFLY, & LENK, JJ.

*Commonwealth Health Insurance Connector Authority. Alien. Constitutional Law,* Equal protection of laws, Judicial review.

This court, applying strict scrutiny, concluded that limiting language incorporated into a legislative appropriation, making available subsidies provided by the Commonwealth Care Health Insurance Program (a premium assistance program in which enrollees pay a portion of their health insurance premium based on a sliding scale with the remainder paid by the Commonwealth Health Insurance Connector Authority, and for which the Commonwealth receives certain Federal reimbursements) only to individuals eligible for certain federally funded public benefit programs, thereby excluding qualified aliens residing in the country for less than five years, violated the equal protection clause of the Massachusetts Constitution, where exclusively fiscal concerns motivated the legislative enactment [236-242]; and where the Commonwealth made no attempt to meet rigorous procedural requirements designed to ensure that the legislation was narrowly tailored to further a compelling interest, and the Commonwealth could not rely on policies and findings of fact expressed by Congress in certain Federal legislation to furnish a compelling interest for discrimination by the Commonwealth in its entirely State-run program [242-249].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on February 25, 2010.

The case was reported by *Cordy*, J.

*Wendy Parmet (Lorianne Sainsbury-Wong* with her) for the plaintiffs.

*Kenneth W. Salinger*, Assistant Attorney General, for the intervener.

*Carl Valvo*, for Commonwealth Health Insurance Connector Authority, was present but did not argue.

[1]Roxanne S. Prince and Jane Does Nos. 1 and 2 (pseudonyms), individually and on behalf of all similarly situated persons.

[2]The executive director of Commonwealth Health Insurance Connector Authority and the Commonwealth, as an intervener.

The following submitted briefs for amici curiae:

*Doreena Wong, Justin Ma, Daniel S. Floyd, Minae Yu, Jordan Bekier, Christopher Punongbayan, & Kimberly Lewis*, of California; *Andrew Kang*, of Illinois; *Miriam Yeung*, of New York; *Erin E. Oshiro, Jessica S. Chia, & Priscilla Huang*, of the District of Columbia; *& Jacinta S. Ma* for Asian Pacific American Legal Center & others.

*Victoria Pulos* for Massachusetts Law Reform Institute & others.

*Ara B. Gershengorn, Katie Marie Perry, John Reinstein, & Laura Rotolo* for American Civil Liberties Union of Massachusetts.

*Sarah F. Anderson, Nancy J. Lorenz, & Jan M. Stiefel* for Chinese Progressive Association & others.

CORDY, J. In this case, we apply strict scrutiny to a legislative appropriation that denied State subsidies for the purchase of health insurance to a category of noncitizen immigrants lawfully residing in the Commonwealth (qualified aliens). Under the appropriation, subsidies provided by the Commonwealth Care Health Insurance Program (Commonwealth Care) were made available only to individuals eligible for federally funded public benefit programs, as set forth in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. No. 104-193, as amended, codified at 8 U.S.C. §§ 1601-1646 (2006), thereby excluding qualified aliens residing in the country less than five years. On a reservation and report from the county court, we determined that this appropriation discriminated on the basis of alienage and national origin, both suspect classifications, and that it therefore should be subjected to strict scrutiny. *Finch* v. *Commonwealth Health Ins. Connector Auth.*, 459 Mass. 655, 668-678 (2011) (*Finch*). We remanded the matter to the county court. *Id.* at 679. The plaintiffs moved for partial summary judgment, seeking a declaration, pursuant to Mass. R. Civ. P. 56 (a), 365 Mass. 824 (1974), that the appropriation violates the principles of equal protection in the Massachusetts Constitution. The single justice again reported the matter to the full court.

The Attorney General was allowed to intervene on behalf of the Commonwealth, and she asserts that the limiting language

incorporated into the appropriation does not violate the equal protection provision of the Massachusetts Constitution, because it advances the compelling interest of furthering the national immigration policies expressed by Congress in PRWORA. We reject the Commonwealth's proffered justification for two reasons. First, in applying the standard of strict scrutiny the court is required to consider the statute's actual purpose, rather than relying on a hypothetical justification. Here, exclusively fiscal concerns, which the Commonwealth concedes are not, on their own, adequate to survive strict scrutiny, motivated the legislative enactment. Second, the strict scrutiny doctrine imposes rigorous procedural requirements on a State, to ensure that legislation is narrowly tailored to further a compelling interest. The Commonwealth made no attempt to comply with those requirements, and the policies and findings of fact expressed by Congress in PRWORA do not furnish a compelling interest for discrimination by the Commonwealth in its entirely State-run program. Consequently, we conclude that the limiting language of the appropriation cannot stand, and we remand the matter to the single justice with instructions to grant the plaintiffs' motion for partial summary judgment.

1. *Background.* The following recitation is abridged from our discussion in *Finch, supra* at 657-661, which in turn drew from the joint stipulation of facts.

Commonwealth Care is a State-initiated program, enacted in 2006, that provides structured premium assistance for low-income Massachusetts residents. Enrollees pay a portion of premium for health insurance coverage, with the remainder paid by the defendant Commonwealth Health Insurance Connector Authority (Connector). See generally G. L. c. 118H. The Connector administers Commonwealth Care.

Both State and Federal funds currently support the provision of premium assistance payments on behalf of Commonwealth Care enrollees. Federal funds are provided through a Medicaid "demonstration project" pursuant to § 1115 of the Social Security Act, codified at 42 U.S.C. § 1315 (2006). In the demonstration project, Commonwealth Care expenditures made on behalf of individuals eligible for Federal benefits are treated as expenditures under the Commonwealth's Medicaid plan and receive partial reimbursement from the Federal government.

Commonwealth Care receives no reimbursement from the Federal government in respect of expenditures made on behalf of federally ineligible individuals.

PRWORA, enacted by Congress in 1996, sets forth an intricate scheme for determining whether aliens are eligible for Federal benefits. Broadly speaking, "qualified alien[s]" include lawful permanent residents and certain other categories of noncitizens, such as refugees or recipients of asylum. See 8 U.S.C. § 1641(b). Qualified aliens may then be divided into those who are eligible for Federal benefits and those who are federally ineligible. Generally, qualified aliens are eligible for Federal benefits, such as Medicaid, only if they have lived in the United States for five years, 8 U.S.C. § 1613(a), or if they fall into specified categories with respect to refugee status, veteran status, or national origin. See 8 U.S.C. § 1612(a); 8 U.S.C. § 1613(b), (d); *Finch, supra* at 658 n.3, 677.

The Commonwealth initially permitted all eligible residents, as defined in G. L. c. 118H, § 1, to enroll in Commonwealth Care. The category "residents" included qualified aliens, even those ineligible for Federal benefits. *Id.* In the absence of Federal reimbursement, the Commonwealth assumed one hundred per cent of the cost of providing Commonwealth Care subsidies to federally ineligible aliens.

In 2009, the Legislature made certain changes to the eligibility requirements of Commonwealth Care. These changes were enacted in a two-part supplemental appropriation for fiscal year 2010. St. 2009, c. 65, § 31 (appropriation). Section 31 (*a*) of the appropriation (§ 31 [*a*]) excluded all aliens who are federally ineligible under PRWORA from participation in Commonwealth Care.[3] Simultaneously, § 31 (*b*) of the appropriation

---

[3]Section 31 (*a*) of St. 2009, c. 65 (§ 31 [*a*]), provides:

> "Except as provided in subsection (*b*), notwithstanding any general or special law to the contrary, an eligible individual pursuant to section 3 of chapter 118H of the General Laws shall not include persons who cannot receive federally-funded benefits under sections 401, 402, and 403 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 [(PRWORA)], Pub. L. No. 104-193, as amended, for fiscal year 2010."

The specific sections of PRWORA referenced in § 31 (*a*) are codified at 8 U.S.C. §§ 1611-1613 (2006).

(§ 31 [*b*]) permitted the establishment of a new entity, the Commonwealth Care Bridge program, which provided a form of health insurance continuation to individuals previously covered by Commonwealth Care but who lost eligibility as a result of § 31 (*a*).[4] Approximately 29,000 legal immigrants lost premium assistance benefits as a result of § 31 (*a*). The plaintiffs are individuals who either have been terminated from Commonwealth Care or have been denied eligibility solely as a result of their alienage.

2. *Discussion.*[5] a. *The Legislature's actual purpose.* To pass strict scrutiny, a law "must be narrowly tailored to further a legitimate and compelling governmental interest and must be the least restrictive means available to vindicate that interest." *Finch*, *supra* at 669, quoting *Commonwealth* v. *Weston W.*, 455 Mass. 24, 35 (2009). We apply the same analysis under strict scrutiny in cases arising under the State Constitution as Federal courts apply when analyzing cases under the Federal Constitution. *Commonwealth* v. *Weston W.*, *supra* at 30 n.9, and cases cited.

Strict scrutiny requires an inquiry into the actual purpose or motivation behind the legislation rather than any purpose hypothesized post hoc during litigation. See *United States* v. *Virginia*, 518 U.S. 515, 533 (1996); *Shaw* v. *Hunt*, 517 U.S. 899, 908 n.4 (1996). To discern the Legislature's motivation in enacting § 31, we avail ourselves of familiar methods of statutory interpretation. The Legislature's intent is "found most obviously in the words of the law itself, interpreted according to their ordinary and approved usage." *Suffolk Constr. Co.* v. *Division of Capital Asset Mgt.*, 449 Mass. 444, 454 (2007). "In

---

[4]This was part of an appropriations bill that expired at the end of fiscal year 2010. The Legislature reenacted all of its relevant provisions in St. 2010, c. 131, § 136, applicable to fiscal year 2011, and St. 2011, c. 68, § 166, applicable to fiscal year 2012.

[5]We acknowledge the amicus briefs submitted by the American Civil Liberties Union of Massachusetts; Asian Pacific American Legal Center, Asian American Justice Center, Asian American Institute, Asian Law Caucus, Asian & Pacific Islander American Health Forum, National Asian Pacific American Women's Forum, and National Health Law Program; Chinese Progressive Association, Chelsea Collaborative, and Community Legal Aid, Inc.; and Massachusetts Law Reform Institute, Health Care for All, Massachusetts Immigrant and Refugee Advocacy Coalition, and Irish International Immigrant Center.

construing the Legislature's intent, we may also enlist the aid of other reliable guideposts, such as the statute's 'progression through the legislative body, the history of the times, prior legislation, contemporary customs and conditions and the system of positive law of which they are part.' " *Id.*, quoting *EMC Corp.* v. *Commissioner of Revenue*, 433 Mass. 568, 570 (2001). Moreover, because the equal protection clause is chiefly concerned with discriminatory intent, see *Washington* v. *Davis*, 426 U.S. 229, 240 (1976), the strict scrutiny doctrine demands an especially thorough inquiry into legislative motive, including "such circumstantial and direct evidence of intent as may be available." *Hunt* v. *Cromartie*, 526 U.S. 541, 546 (1999), quoting *Arlington Heights* v. *Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

Fiscal considerations alone cannot justify a State's invidious discrimination against aliens. *Graham* v. *Richardson*, 403 U.S. 365, 374 (1971). Knowing this, the Commonwealth does not attempt to justify § 31 (*a*) solely on fiscal grounds. Rather, it claims that the plain language of § 31 (*a*) evinces an additional nonfiscal purpose: furthering the national policies articulated in the preamble to PRWORA.

The preamble to PRWORA articulates two congressional policy interests — promoting self-sufficiency among aliens and reducing incentive for illegal immigration:

> "(5) It is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy.

> "(6) It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits."

8 U.S.C. § 1601. According to the Commonwealth, the reference to PRWORA in the text of § 31 (*a*) compels the inference that the Legislature intended to further these national policy interests. We disagree.

As an initial matter, the plain text provides at best equivocal support for the Commonwealth's position. Section 31 (*a*) refers

only to those sections of PRWORA that specify qualifications for funding. It never references the provisions of PRWORA that articulate national immigration policy. While we presume that the Legislature was aware of Congress's policy statements, it does not necessarily follow that those statements motivated the Legislature to enact the appropriation.

It is far more likely that the Legislature simply referred to the operative language of PRWORA without taking any position on its policies, as it did in 2006 when setting up Commonwealth Care. In that initial legislative act, eligibility for Commonwealth Care was in part determined by reference to a provision in PRWORA defining "qualified alien." G. L. c. 118H, § 1 (defining "resident" to include "qualified alien" as defined in PRWORA). The effect of adopting this definition was to make eligible all resident qualified aliens (including those ineligible for Federal benefits) to receive benefits from the Commonwealth Care program. G. L. c. 118H, § 3 (extending Commonwealth Care to "resident[s]"). Plainly, the Legislature did not intend to indorse PRWORA's policies by referring to one of its definitional provisions in G. L. c. 118H. Similarly, there is no reason to believe that a single reference to an eligibility provision of PRWORA in § 31 (a) carried any immigration policy endorsement beyond definitional.

The interplay of § 31 (a) with § 31 (b) furnishes additional evidence that the Legislature did not seek to further national immigration policy. "[W]e construe the various provisions of a statute in harmony with one another, recognizing that the Legislature did not intend internal contradiction." *DiFiore* v. *American Airlines, Inc.*, 454 Mass. 486, 491 (2009), citing *Locator Servs. Group, Ltd.* v. *Treasurer & Receiver Gen.*, 443 Mass. 837, 859 (2005). While § 31 (a) excludes federally ineligible immigrants from Commonwealth Care, § 31 (b) authorizes State officials to establish a less costly, partially subsidized insurance plan for the immigrants disenrolled from the program. Providing even partial benefits is inconsistent with PRWORA's policy of fostering self-sufficiency among aliens. It is perfectly consistent, however, with a State interest in reducing spending.

The location of § 31 (a) within the statutory scheme also

points to an exclusively fiscal motivation. Section 31 (*a*) and its successors are located in outside provisions of appropriations bills, and their application is expressly limited to a single fiscal year. Although outside sections of appropriations acts certainly may be used to enact general legislative amendments, *First Justice of the Bristol Div. of the Juvenile Court Dep't* v. *Clerk-Magistrate of the Bristol Div. of the Juvenile Court Dep't*, 438 Mass. 387, 408 (2003), it would be unusual for the Legislature to adopt a new immigration policy in such an oblique and temporary manner. Because the appropriation never repealed the Commonwealth Care statute, it is, again, far more likely that the Legislature enacted § 31 (*a*) and (*b*) as a temporary stopgap, necessitated by fiscal circumstances, while continuing to abide by the policy articulated in the original Commonwealth Care statute of "reducing uninsurance in the Commonwealth," G. L. c. 118H, § 2, across its entire resident population.

Were there any ambiguity in the language or statutory scheme, the legislative history and historical background provide pervasive evidence of legislative purpose. The appropriation arose directly out of an unforeseen revenue shortfall in the wake of the 2008 financial crisis. The proponents of § 31 (*a*) repeatedly invoked fiscal concerns, while failing to articulate any interest whatsoever in national immigration policy.

In May, 2009, in the wake of the financial crisis, the State reduced its tax revenue estimate by over $1.5 billion. The Legislature, well into its task of preparing the budget for fiscal year 2010, was forced to grapple with this drastically reduced revenue estimate.

On May 13, 2009, the Senate Ways and Means Committee proposed to limit Commonwealth Care to United States citizens. 2009 Senate Doc. No. 3, § 77. The committee's chairman justified this proposal to the press:

> "Senator Steven Panagiotakos, chairman of the Senate Ways and Means Committee, said lawmakers are not targeting immigrants as such, but propose the cuts because the 28,000 'special status' immigrants at issue do not qualify for matching federal subsidies. Thus, they are more expensive for the state to insure. . . .

" 'The federal government doesn't recognize them until they're here five years, and thirty three other States don't cover this population either,' he said. 'With the depths of the budget cuts we are dealing with, everyone is going to share in the pain and some, unfortunately, more than others.' "

Senate's Health Cuts Stir Outrage, Boston Globe, May 15, 2009, at A1.[6] The Legislature passed a revised conference bill on June 19, 2009, which contained a section excluding federally ineligible immigrants from Commonwealth Care. 2009 House Doc. No. 4129, § 121.

Instead of signing that section of the conference bill, the Governor returned it to the Legislature with an amendment. This amendment (the forerunner of the subsequently enacted § 31 [a] and [b]) provided for the exclusion of immigrants ineligible for Federal funding from Commonwealth Care and authorized the creation of a less costly insurance plan for immigrants excluded from Commonwealth Care, which capped the future subsidy at $70 million in State funds. The Governor's message of June 29, 2009, stated in pertinent part:

> "We are in the midst of a fiscal crisis. Since last Fall, when an unprecedented global economic decline began to cause state tax revenues to plummet, my Administration and the Legislature have worked together to close a cumulative $3.9 billion gap in the fiscal year 2009 budget and a projected $5.1 billion gap in the fiscal year 2010 budget. . . .
>
> "Along with signing most of the conference committee budget into law, I am taking additional action to address important Commonwealth priorities that were not adequately addressed by the conference committee budget. For example, the conference committee budget terminated Commonwealth Care health insurance coverage for approxi-

---

[6] We normally caution against inferring legislative intent from the statements of a single legislator outside the legislative record. *Administrative Justice of the Hous. Court Dep't* v. *Commissioner of Admin.*, 391 Mass. 198, 205 (1984), and cases cited. Here, however, the formal legislative history, as detailed herein, provides conclusive indication of the Legislature's intent. We provide Senator Panagiotakos's statement simply for narrative completeness.

mately 30,000 legal immigrants, a successful feature of our health care reform experiment. This would be a major step backwards from our progress at a time when the eyes of our nation are focused on this groundbreaking initiative. I am accordingly proposing an additional $70 million in funding to continue state-subsidized health insurance for these residents — and ensure that our state continues to lead the nation in offering high-quality, affordable health care to all."

2009 House Doc. No. 4139.[7]

The Legislature adopted the Governor's proposal, except that it reduced the supplemental funding from $70 million to $40 million. § 31 (b). In his signing statement on August 7, the Governor again referenced fiscal concerns:

"I am approving $40 million in additional funding to help meet the health care needs of legal immigrants who will be disenrolled from their existing Commonwealth Care health insurance because they do not currently qualify for federal reimbursement. I appreciate the difficult budget choices that have to be made in this tough economic environment. Thus, the fact that the Legislature has expressed a desire to continue to provide funding for health care for all legal, taxpaying residents in these difficult fiscal times is heartening.

"While we appreciate this statement of support, I regret that the Legislature did not approve my prior requests for full funding of approximately $130 million to maintain their existing Commonwealth Care coverage, or, as a subsequent compromise proposal, $70 million to offer them a modified health insurance package for the remainder of the fiscal year. The failure to provide the requested level of funding imposes significant constraints on our capacity to fund health services for this population in fiscal year 2010. We will work within these constraints to put the $40 million in funding appropriated by the

---

[7]We routinely look to the Governor's message to assist our interpretation of statutes. See *Strasnick* v. *Board of Registration in Pharmacy*, 408 Mass. 654, 659 (1990); *Boston* v. *Massachusetts Bay Transp. Auth.*, 373 Mass. 819, 826 n.9 (1977).

> Legislature to the best possible use to address these health care needs during this fiscal year, recognizing that there will be limitations to what we can achieve. At the same time, we will continue striving for a long-term solution that offers comprehensive, affordable coverage to these legal residents."

Governor's Message, 2009 House Doc. No. 4206. Thus, the Governor repeatedly cited fiscal concerns as the impetus for cutting funding for immigrants. Neither the governor, the chairman of the Senate Ways and Means Committee, nor any other legislator made reference to the national immigration policy of PRWORA.[8]

In sum, the text, statutory scheme, and legislative history of the appropriation emphatically point to one conclusion: the motivation for § 31 (a) was exclusively fiscal.

b. *Procedural requirements of strict scrutiny.* The strict scrutiny doctrine imposes rigorous procedural requirements on a State, to ensure that legislation truly is narrowly tailored to further a compelling interest. See *Grutter* v. *Bollinger*, 539 U.S. 306, 339-340 (2003). "The State must specifically identify an 'actual problem' in need of solving." *Brown* v. *Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2738 (2011), quoting *United States* v. *Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822-823 (2000). Furthermore, narrow tailoring requires "serious, good faith consideration" of "workable" nondiscriminatory alternatives that will achieve the Legislature's goals. *Grutter* v. *Bollinger*, *supra* at 339. Those requirements were not met here. Even had the Legislature intended to further national immigration policy, the summary method by which the Legislature adopted the appropriation does not satisfy strict scrutiny.

We decline to reach the question whether national immigration policy can ever serve as a compelling interest for the purposes

---

[8]The evolution of the successor statutes likewise evinces preoccupation with fiscal concerns. See, e.g., 2010 House Doc. No. 4840 (Governor's message urging administrators to use "available resources and savings initiatives" to extend Commonwealth Care Bridge program benefits to aliens who had been denied Commonwealth Care). Because the Commonwealth does not contend that the successor statutes had a different purpose from § 31, we need not elaborate.

of strict scrutiny. At the same time, no published judicial opinion has ever endorsed national immigration policy as a compelling State interest for the purposes of strict scrutiny. See *Ehrlich* v. *Perez*, 394 Md. 691, 731 & n.23 (2006) ("we do not find the reasons provided in PRWORA to justify denying eligibility for federal benefits [promoting self-sufficiency and discouraging illegal aliens] to meet the strict scrutiny standard of review"); *Aliessa* v. *Novello*, 96 N.Y.2d 418, 435 (2001) ("We conclude that [the statute] is subject to — and cannot pass — strict scrutiny, notwithstanding [PRWORA's] authorization").[9] The Commonwealth accordingly must traverse an especially "high hurdle," *Finch*, *supra* at 680 n.1 (Gants, J., concurring in part and dissenting in part), to demonstrate that immigration policy is a compelling State interest, and that the appropriation is narrowly tailored to satisfy that interest. The Commonwealth has not met its burden.

To clarify the burden incumbent on the Commonwealth, we review the evidence supporting State actions that have recently satisfied strict scrutiny. In *Commonwealth* v. *Weston W.*, 455 Mass. 24, 35-38 (2009), we upheld the civil provisions of a juvenile curfew in the city of Lowell. The city council adopted the ordinance "after months of planning, debating, and researching models from other cities," in response to a rapid increase of juvenile crime and gang activity. *Id.* at 36. Similarly, in *Brackett* v. *Civil Serv. Comm'n*, 447 Mass. 233, 243 (2006), we upheld a policy of minority preference in Massachusetts Bay Transportation Authority (MBTA) police hiring. We carefully examined the statistics of minorities in MBTA police positions before concluding that there was a "strong basis in evidence" for the need to remedy past discrimination. *Id.* at 244-246 (minorities comprised twenty-seven per cent of MBTA patrol officers but seven per cent of sergeants); 247-252 (shortfall of women in MBTA police had only one in 6,000 probability of happening by chance). In *Blixt* v. *Blixt*, 437 Mass. 649, 660-666 (2002), cert. denied, 537 U.S.

---

[9]Two recent, unpublished opinions from United States District Courts have reached the same conclusion when considering limitations similar to § 31 (*a*). See Unthaksinkun *vs.* Porter, U.S. Dist. Ct., No. C110588JLR (W.D. Wash. Sept. 28, 2011) (granting preliminary injunction to immigrant plaintiffs because State could not satisfy strict scrutiny); Korab *vs.* Koller, U.S. Dist. Ct., Civ. No. 10-00483JMS/KSC (D. Haw. Dec. 13, 2010) (same).

1189 (2003), we upheld a grandparent visitation statute that distinguished between minor children whose parents are living together and those whose parents are living separately. The statute served the compelling interest of "mitigating potential harm to children in nonintact families, an area in which the State has been traditionally and actively involved." *Id.* at 657. Perhaps in recognition of the storied pedigree of this State interest, see *id.* at 656-657 & nn.10-13, we may have applied strict scrutiny less rigorously. See *id.* at 690 (Sosman, J., dissenting). We still observed that the Legislature relied on "social experience" and "studies show[ing] that, in the over one-quarter of households in which children are raised by single parents, grandparents may play an increasingly important role in child rearing." *Id.* at 663. We also construed the law narrowly to ensure that parental rights were infringed only when necessary to protect the best interests of the child. *Id.* at 657-660.

Here, by contrast, there was no legislative inquiry concerning the self-sufficiency of legal immigrants in Massachusetts. Nor did the Legislature ever evaluate whether withholding State subsidies for health insurance from legal immigrants is narrowly tailored to promote such self-sufficiency. The Legislature referenced PRWORA a single time in an appropriations statute. This conclusory method does not satisfy strict scrutiny.

Conceding the point, the Commonwealth argues that it is entitled to bypass the procedural requirements of strict scrutiny because it may rely on Congress's findings of facts with respect to immigration. By adopting the PRWORA eligibility rules, argues the Commonwealth, the Legislature "effectuate[d] national policy" and "address[ed] the Congressional concern (not just a parochial state concern) that 'individual aliens not burden the public benefits system.' " *Soskin v. Reinertson,* 353 F.3d 1242, 1255 (10th Cir. 2004), quoting 8 U.S.C. § 1601(4). Furthermore, argues the Commonwealth, because § 31 (*a*) adopts PRWORA's eligibility rules "jot for jot," it is, by definition, narrowly tailored to further the national policies reflected in those rules.

We reject the Commonwealth's novel approach. The Legislature may not lean on Federal policy as a crutch to absolve it of examining whether its own invidious discrimination is truly necessary.

To explain why the Commonwealth's argument fails, we review the analytical distinction between congressional action and State action developed in *Finch*. Congress enjoys "plenary authority under the United States Constitution when it legislates the rights and benefits to be afforded aliens present in this country." *Doe* v. *Commissioner of Transitional Assistance*, 437 Mass. 521, 526 (2002) (*Doe*), citing *Mathews* v. *Diaz*, 426 U.S. 67, 81-85 (1976). By contrast, a State's classifications "based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." *Graham* v. *Richardson*, 403 U.S. 365, 372 (1971).

There is an exception to the general rule that State laws that discriminate on the basis of alienage are subject to strict scrutiny. See *Finch*, *supra* at 670-671; *Doe*, *supra* at 526. Where Congress has enacted "uniform national guidelines and policies dictating how States are to regulate and legislate issues relating to aliens," this "general rule [subjecting the State classification to strict scrutiny] does not apply . . . to State laws that merely adopt uniform Federal guidelines." *Id.* While no State may exercise a power similar to that of Congress's plenary authority, "if the Federal Government has by *uniform rule* prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction" (emphasis added). *Id.*, quoting *Plyler* v. *Doe*, 457 U.S. 202, 219 n.9 (1982).

We held in *Finch* that strict scrutiny is appropriate where "Congress enacts a noncompulsory rule and the Commonwealth *voluntarily* 'adopt[s] those national policies and guidelines' " (emphasis added). *Finch*, *supra* at 671-672, quoting *Doe*, *supra* at 527. "Where the Federal government has made a binding decision regarding the treatment of aliens, that decision will be reviewed according to the standards applicable to the Federal government even though the immediate actor may be a State government. . . . In comparison, where the State *acts on its own authority*, it cannot shelter behind the existence of Congress's plenary authority and its actions are subject to strict scrutiny review. . . . It is irrelevant that the same result could have been imposed on the State by the Federal government pursuant to the supremacy clause." (Citations omitted.) (Emphasis added.) *Finch*,

*supra* at 672. In other words, if Congress believed that excluding aliens from State health care benefits such as those provided by Commonwealth Care were a compelling national interest, it could have compelled States to forbear from paying them. It did not do so in PRWORA.

Commonwealth Care is indisputably an independent State program, entirely under State control, and not bound by uniform Federal rules. "Here, no party has argued that the Commonwealth was required to apply PRWORA's eligibility classification to Commonwealth Care. Indeed, for three years after Massachusetts established the program, Commonwealth Care provided benefits to qualified aliens without any suggestion that such benefits were in violation of or inconsistent with PRWORA." *Id.* "This is a State action that, in the absence of some exception rooted in constitutional principles rather than policy concerns, is subject to strict scrutiny . . . ." *Id.* at 671 n.16.

We must reject the Commonwealth's proposed reliance on Congress's fact finding and policies, because its position would render the uniformity rule, a well-settled principle of United States Supreme Court jurisprudence, a nullity. If effectuating PRWORA's noncompulsory policy objectives as part of an exclusively State administered program were a compelling State interest, it would render superfluous the threshold determination whether Congress has enacted a uniform mandate. See *Plyler* v. *Doe, supra* at 219 n.19; *Graham* v. *Richardson, supra* at 382. The requisite inquiry into whether a Federal directive is a uniform or noncompulsory rule would become irrelevant because the State's invidious classification would survive under either constitutional standard of review: if the State's discriminatory classification were mandated by a uniform rule, it would prevail under a deferential rational basis examination, and if it were noncompulsory but consistent with PRWORA's policy aims, it would prevail under strict scrutiny because it was supported by the proffered compelling interest.

In essence, the Commonwealth seeks to collapse the review of State discrimination between citizens and aliens in the award of State benefits into a single, and highly relaxed, inquiry: whether any invidious classification, regardless of its application at the direction of Congress, is harmonious with PRWORA's

nonbinding preamble. It asks the court to ignore the clear dichotomy between uniform rules and noncompulsory policy preferences adopted by the United States Supreme Court, and strongly emphasized in *Finch* and *Doe*. But we may not disregard binding precedent and defy the logic of the rule that precedent imposed: that a "congressional enactment construed so as to *permit* state legislatures to adopt divergent laws on the subject of citizenship requirements for federally supported welfare programs would appear to contravene this explicit constitutional requirement of uniformity" (emphasis supplied). *Graham* v. *Richardson*, *supra* at 382.

The Commonwealth contends that the invidious classification in § 31 (*a*) is similar to race-based classifications in cooperative Federal-State transportation contracting, for which courts examining State programs have applied a more relaxed strict scrutiny test. See Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, 112 Stat. 107 (1998) (TEA-21). Under the regulations implementing TEA-21, the States create programs "designed to increase the participation of socially and economically disadvantaged individuals in . . . highway construction subcontracting." *Northern Contr., Inc.* v. *State*, 473 F.3d 715, 717 (7th Cir. 2007) (*Northern Contr., Inc.*). These programs aim to award a threshold percentage, determined by the State, of State transportation contracts to minority-owned businesses. See 49 C.F.R. § 26.45 (2010). Approval of the State programs by the United States Department of Transportation is a precondition for the receipt of Federal highway funds. 49 C.F.R. § 26.21(a) (2010). Congress has set an aspirational goal that ten per cent of Federal highway funds be expended with minority contractors. See TEA-21, *supra* at § 1101(b)(1), 112 Stat. 113; 49 C.F.R. § 26.41 (2010).

Following the implementation of TEA-21 in 1999, nonminority subcontractors challenged the State programs on equal protection grounds. See *Northern Contr., Inc., supra*; *Western States Paving Co.* v. *Washington State Dep't of Transp.*, 407 F.3d 983 (9th Cir. 2005), cert. denied sub nom. *Vancouver* v. *Western States Paving Co.*, 546 U.S. 1170 (2006) (*Western States Paving Co.*); *Sherbrooke Turf, Inc.* v. *Minnesota Dep't of Transp.*, 345 F.3d 964 (8th Cir. 2003), cert. denied, 541 U.S. 1041 (2004) (*Sherbrooke Turf, Inc.*).

The reviewing courts bifurcated their analysis between the compelling interest and narrow tailoring prongs of strict scrutiny. They unanimously held that the States were entitled to rely on the compelling interest — remedying past discrimination — articulated by Congress. See *Northern Contr., Inc.*, supra at 720-721; *Western States Paving Co.*, supra at 997 ("When Congress enacted TEA-21, it identified a compelling nationwide interest in remedying discrimination in the transportation contracting industry. Even if such discrimination does not exist in Washington, the State's implementation of TEA-21 nevertheless rests upon the compelling nationwide interest identified by Congress"); *Sherbrooke Turf, Inc.*, supra at 970.

With respect to narrow tailoring, the courts were split. Two out of these three circuit courts of the United States Court of Appeals insisted that each State demonstrate that its minority set-aside was narrowly tailored to conditions within the State. See *Western States Paving Co.*, supra at 997-1003 (invalidating Washington's program because record was devoid of any evidence that minorities had ever suffered discrimination in Washington transportation contracting industry); *Sherbrooke Turf, Inc.*, supra at 973-974 (upholding Minnesota's and Nebraska's programs as narrowly tailored to conditions within those States). The third court maintained that a State is insulated from constitutional attack, even regarding narrow tailoring, absent a showing that it exceeded its Federal authority. *Northern Contr., Inc.*, supra at 721-722.

The Federal highway subcontracting cases provide scant support for the Commonwealth's position. First, the classifications challenged in those cases were race-based preferences, for which both the States and the Federal government are subject to strict scrutiny. *Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200, 235 (1995). By contrast, as discussed above, Congress's immigration policy is only subject to rational basis review. *Mathews* v. *Diaz*, 426 U.S. 67, 80 (1976). Because Congress needed only to satisfy rational basis review, it was never required to establish that its policies were compelling interests that would withstand strict scrutiny review. See *Chicago* v. *Shalala*, 189 F.3d 598, 605-607 (7th Cir. 1999), cert. denied, 529 U.S. 1036 (2000). By no means did the highway contracting cases authorize a State to borrow a Federal "rational basis" interest and dress it up as a

"compelling interest" as applied to its own programs, at least in the absence of a uniform rule.

Second, two of the three circuit courts considering the highway contracting cases still required the States to demonstrate that their race-based discrimination was narrowly tailored to the conditions in their States. See *Western States Paving Co., supra* at 997-1003; *Sherbrooke Turf, Inc., supra* at 973-974. The Commonwealth has provided no evidence in support of narrow tailoring here. See *supra.*

Finally, the third court absolved the State of conducting a narrow tailoring analysis, but only because it viewed the State as "acting as an instrument of federal policy and [the plaintiff] cannot collaterally attack the federal regulations through a challenge to [the State's] program." *Northern Contr., Inc., supra* at 722. Essentially, in the view of the United States Court of Appeals for the Seventh Circuit, Congress mandated the States to establish race-based classifications in order to participate in a Federal funding program. PRWORA contains no similarly compulsive uniform Federal rule made binding on the Commonwealth as a condition of receiving Federal reimbursements through the Medicaid demonstration project. See *Finch, supra* at 673. The plaintiffs are challenging the Commonwealth's policy, not the policy of the Federal government. We must therefore apply the strict scrutiny doctrine with all its vigor.

3. *Conclusion.* Section 31 (*a*) cannot pass strict scrutiny. The discrimination against legal immigrants that its limiting language embodies violates their rights to equal protection under the Massachusetts Constitution.

We recognize that our decision will impose a significant financial burden on the Commonwealth. See *Finch, supra* at 675. Nonetheless, "the fiscal consequences of any . . . judgment on the merits cannot be permitted to intrude on consideration of the case before us. . . . '[M]inorities rely on the independence of the courts to secure their constitutional rights against incursions of the majority, operating through the political branches of government.' " *Id.*, quoting *Commonwealth* v. *O'Neal,* 369 Mass. 242, 271 (1975) (Tauro, C.J., concurring). If the plaintiffs' right to equal protection of the laws has been violated by the enactment of § 31, then it is our duty to say so.

The case is remanded to the single justice, with instructions to enter partial summary judgment in favor of the plaintiffs.

*So ordered.*