NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

23-P-874                                          Appeals Court

ADOPTION OF XADEN (and four companion cases[1]).


No. 23-P-874.

Bristol.     April 1, 2024. - August 6, 2024.

Present:  Massing, Shin, & D'Angelo, JJ.


Parent and Child, Adoption, Care and protection of minor.
    Adoption, Care and protection.  Interstate Compact on
    Placement of Children.


Petition filed in the Bristol County Division of the
Juvenile Court Department on June 3, 2016.

The case was heard by Michaela C. Stewart, J.


Laura E. Openshaw for Xaden.
Roberta Driscoll-Weiss for the mother.
Kathryn G. Foster for the father of Arlo, Beth, Laura, and
Susan.
Abigail Salois, Committee for Public Counsel Services, for
the father of Xaden.
Jeremy Bayless for Department of Children and Families.
Peter Heffernan for Arlo & another.
Garry M. O'Brien for Beth & another.


---

[1] Adoption of Arlo; Adoption of Beth; Adoption of Laura; and
Adoption of Susan.  The children's names are pseudonyms.

D'ANGELO, J. After a trial, a judge of the Juvenile Court issued decrees finding the mother, and the father of Arlo, Beth, Laura, and Susan,[2] unfit to parent the children and ordering termination of their parental rights. The judge also found the mother unfit and terminated her parental rights with respect to her oldest child, Xaden. The judge did not, however, find Xaden's father unfit. Nonetheless, the judge ordered that Xaden remain in the temporary custody of the Department of Children and Families (department) until completion of a home study of his father's home in Pennsylvania pursuant to the Interstate Compact on the Placement of Children (ICPC), St. 1963, c. 452, § 1.

On appeal, Xaden's father, joined by Xaden, argues that the judge erred by requiring him to complete an ICPC home study when the department did not establish that he was unfit to parent Xaden. We agree and hold that because the department did not meet its burden of proving unfitness, custody of Xaden should not have been withheld from his father pending compliance with the ICPC.[3]

---

[2] We refer to Arlo, Beth, Laura, and Susan collectively as "the younger children."

[3] As discussed further below, while this appeal was pending, the judge granted permanent custody of Xaden to his father. Xaden's father concedes that this rendered his appeal moot. Although we generally do not decide moot cases, we agree with

Xaden, joined by the mother, also argues that the judge should not have terminated the mother's parental rights to Xaden because the goal for Xaden was not adoption. Additionally, the mother and the father of the younger children argue that the judge erred in finding that the adoption plan presented by the department serve the best interests of the younger children. We affirm.

Background. From 2016 to 2019, the department filed petitions pursuant to G. L. c. 119, § 24, ultimately alleging that all five children were in need of care and protection. By 2019, all five were in the department's custody. A termination of parental rights trial began in September 2021 and concluded in June 2022. The judge found the mother and the father of the younger children unfit and issued decrees in August 2022, terminating their parental rights. The judge did not terminate the parental rights of Xaden's father.

In January 2023, the judge issued detailed written findings and conclusions in support of her decision and approving the department's plan for adoption of the younger children by their

---

Xaden's father that his appeal falls within an exception to the general rule because the issues he raises are "of public importance, fully argued and briefed on all sides, very likely to arise again in similar factual circumstances, and might otherwise evade appellate review." Care & Protection of Walt, 478 Mass. 212, 219 (2017). We will therefore address the substance of his arguments.

foster parents.  The judge found the mother and the father of the younger children unfit based on several factors, including domestic violence in their relationship, mental health issues, lack of stable housing, and unsanitary and unsafe home conditions.  Neither the mother nor the father of the younger children challenges the judge's findings of unfitness on appeal. They do, however, argue that the judge erred in approving the adoption plan for the four younger children.

The judge also found that the department failed to prove that Xaden's father was unfit to parent him.  Instead of awarding Xaden's father immediate custody of Xaden, however, the judge ordered him "to comply with the ICPC process" and wrote that "failure to do so may result in a change in the custody status of [Xaden]."  One month later, Xaden's father filed a motion for "direct custody," arguing that the ICPC by its terms does not apply to parents and that imposing the ICPC requirements on him violated his constitutional rights.  The judge denied the motion without comment.

In April 2023, after Pennsylvania authorities eventually approved Xaden's father's home, the department placed Xaden with him.  Xaden remained in the legal custody of the department, however.  It was not until October 2023 -- fourteen months after the judge found that the department failed to prove Xaden's

father unfit -- that the judge finally granted him permanent custody of Xaden.

Discussion. 1. ICPC. Xaden's father, who lived in Pennsylvania at the time of trial, argues that the ICPC should not prevent or delay placement of a child with a parent who has not been deemed unfit and about whom protective concerns have not been raised. At oral argument, he confirmed that he is not challenging the application of the ICPC to him while the care and protection proceeding was still pending. The limited issue he raises, and the only one we decide, is whether the judge erred by requiring him to complete the ICPC process as a condition of obtaining permanent custody of Xaden, even though the judge had found after the trial that the department failed to meet its burden of proving him unfit.

As we explained in Adoption of Knox, 102 Mass. App. Ct. 84, 88 (2023), "[t]he ICPC provides an administrative structure through which a child welfare agency, such as [the department], can place a child in a different State while ensuring that such placement is adequately screened, supervised, and supported." The ICPC applies when an agency seeks to transfer a child out of State "for placement in foster care or as a preliminary to a possible adoption." St. 1963, c. 452, § 1. Thus, by its terms, the ICPC does not extend to placement of a child with an out-of-State parent because "[c]hildren in the care of their own

parents are not in 'foster care' in any ordinary sense of that phrase." In re Emoni W., 305 Conn. 723, 734-735 (2012). Despite the literal language of the ICPC, however, other jurisdictions have reached differing conclusions as to whether the ICPC can nonetheless be applied to out-of-State parents. Several jurisdictions have construed the statutory language strictly to conclude that the ICPC is never applicable to parents. Others have concluded that out-of-State parents can be required to comply with the ICPC process in some circumstances. See Adoption of Knox, supra at 91 n.12 (collecting cases).

In Adoption of Knox, 102 Mass. App. Ct. at 91, we took the latter view and concluded that the judge did not err in finding that an ICPC agreement was required before the child could be returned to the mother, who was living in New Hampshire. We reasoned that "[t]he fact that the ICPC itself does not require that there be an ICPC agreement in place hardly means that [the department], or a judge, could not require this in appropriate circumstances." Id. at 89.

Seizing on this language, the department argues here that the "appropriate circumstances" that existed in Adoption of Knox also exist in this case.[4] We disagree. In Adoption of Knox, the

_____

[4] Our decision in Adoption of Knox relied in part on the fact that in that case the department had invoked the ICPC in reliance on a duly promulgated regulation. See Adoption of

mother had stipulated to her temporary unfitness and had been adjudicated currently unfit after a trial. See id. at 86-87. The care and protection proceeding was still pending when the department was exploring placement of the child with the mother in New Hampshire. See id. at 91-92. In those circumstances, we concluded that "it would have been highly imprudent -- at a minimum -- to return [the child] to New Hampshire without the support and oversight that an ICPC agreement would provide." Id. at 92. See Adoption of Warren, 44 Mass. App. Ct. 620, 621-622 (1998) (receiving State had protective concerns about father's criminal history, poor living conditions, and inability fully to understand and to address child's significant emotional and behavioral problems). Here, in contrast, the judge found after a multiday trial that the department failed to meet its burden of proving that Xaden's father was unfit.

Notwithstanding its failure to establish the unfitness of Xaden's father, the department suggests that it was still appropriate to require him to comply with the ICPC process because there was evidence presented at trial of protective concerns relating to his Pennsylvania home. But even assuming,

---

Knox, 102 Mass. App. Ct. at 89-90, citing 110 Code Mass. Regs. § 7.503(8) (2008). In this case, the department relies solely on Adoption of Knox and makes no separate argument that its regulations authorized the judge's use of the ICPC. Accordingly, we need not address the argument raised by Xaden's father that the regulations are ultra vires.

without deciding, that there may be situations where evidence of legitimate protective concerns presented at trial (falling short of establishing unfitness) would warrant application of the ICPC, the evidence here did not establish any such concerns about Xaden's father.

As the judge found, Xaden's father moved back to Pennsylvania, where he had grown up, in May 2018, and two home studies of his apartment were conducted the following year. Both studies disapproved the placement solely on the ground that the apartment did not have enough space, which is not a legitimate reason to deny custody to a parent. Cf. 110 Code Mass. Regs. § 1.11 (2008) ("children should never be removed from their parents and placed into substitute care on the sole basis of homelessness of a family"). Moreover, although a third home study request submitted by the department also ended unfavorably because Xaden's father failed to make himself available, a court investigator subsequently traveled to his apartment during the trial and succeeded in conducting a home study.

Based on the investigator's observations, the judge found that Xaden's father lived in a "well-kept" apartment building in a residential neighborhood, that the bedroom was set up with a bed for Xaden, that Xaden's father had located a school and pediatrician's office near the apartment, and that he would be

able to shift his work schedule to accommodate Xaden's schooling. Xaden's paternal grandmother also lived nearby, and she testified that she would "assist [Xaden's father] in caring for [Xaden]." The evidence therefore did not show any legitimate protective concerns for placement of Xaden with his father.

The ICPC is a valuable tool for the Commonwealth to ensure that children remain safe when they are placed with families living in other States. Where a care and protection case is pending, and either temporary unfitness has been established or there are legitimate protective concerns regarding the out-of-State parent, the ICPC facilitates a thorough assessment of the receiving State placement to ensure that the placement will serve the child's best interests. See Adoption of Knox, 102 Mass. App. Ct. at 91-92. But these considerations are not present where a judge finds that the department failed to prove unfitness because, "absent a showing to the contrary," which was not made in this case, "we presume a fit parent will act in [his] child's best interest." Martinez v. Martinez-Cintron, 93 Mass. App. Ct. 202, 205 (2018). Accord Blixt v. Blixt, 437 Mass. 649, 658 (2002), cert. denied, 537 U.S. 1189 (2003).

We therefore conclude that, because the department failed to prove at trial that Xaden's father was unfit, the judge erred by requiring him to comply with the ICPC process and delaying

placement of Xaden with him until a full ICPC assessment was completed.  See Green v. Division of Family Servs., 864 A.2d 921, 928 (Del. 2004) (concerns that ICPC seeks to address are not implicated "where the fitness of a non-custodial parent is not in doubt, and no continuing supervision will be necessary").  We need not decide whether, as the department suggests, there may be circumstances where the trial evidence, although not establishing unfitness, would still warrant invoking the ICPC process because of protective concerns regarding the out-of-State parent's home.  Even assuming there may be such circumstances, they would be extraordinary.  The evidence in this case did not establish any legitimate protective concerns about Xaden's father's home, let alone present extraordinary circumstances justifying withholding custody of his child from him when the department failed to prove him unfit.

Were we to conclude otherwise, serious constitutional questions would arise.  "Parental rights to raise one's children are essential, basic rights that are constitutionally protected."  Adoption of Vito, 431 Mass. 550, 562 (2000).  See Care & Protection of Jaylen, 493 Mass. 798, 807 (2024) (parents have a "fundamental right . . . to make decisions concerning the care, custody, and control of their children" [citation omitted]).  General Laws c. 119, § 24, protects that basic right by prohibiting the department from removing a child from a

parent's care, even temporarily, unless it can show that removal "is necessary to protect the child from serious abuse or neglect."

Here, the department presented no evidence that Xaden would be at risk of serious abuse or neglect in his father's care, yet his father was denied physical custody for eight months and denied legal custody for fourteen months pending completion of the lengthy ICPC home study process. This did not comport with either the protections afforded by G. L. c. 119 or constitutional principles. See Commonwealth v. Roman, 489 Mass. 81, 86 (2022), quoting Finch v. Commonwealth Health Ins. Connector Auth., 459 Mass. 655, 668-669 (2011), S.C., 461 Mass. 232 (2012) (State action that "burdens the exercise of a fundamental right protected by our State Constitution . . . is subject to strict judicial scrutiny," under which State action "must be narrowly tailored to further a legitimate and compelling governmental interest and must be the least restrictive means available to vindicate that interest"); Adoption of Vito, 431 Mass. at 563 ("State intrusion in the rearing of children by their parents may be justified only in limited circumstances"). See also Matter of B.H. & G.H., 398 Mont. 275, 304 (2020) ("A request for an ICPC cannot be used to diminish the protections for parents provided [by statute] simply because the parent lives across state lines").

2.  <u>Termination of the mother's parental rights to Xaden</u>.
The mother and Xaden argue that the judge abused her discretion
in terminating the mother's right to parent Xaden.  In
particular, they argue that because the goal for Xaden was not
adoption, but reunification with his father, and because Xaden
now lives with his father in Pennsylvania, terminating the
mother's parental rights was not necessary to protect Xaden from
harm or to facilitate his transition to a permanent placement.
We disagree.

"Termination of parental rights may occur only after a
judge determines that a parent is unfit and that termination is
in the child's best interest."  <u>Adoption of Malik</u>, 84 Mass. App.
Ct. 436, 438 (2013).  "When reviewing a decision to terminate
parental rights, we must determine whether the trial judge
abused his discretion or committed a clear error of law."
<u>Adoption of Elena</u>, 446 Mass. 24, 30 (2006).  When a child has
been placed with one parent, the judge may determine that
termination of the noncustodial parent's parental rights serves
the best interests of the child when doing so "significantly
eases the [child's] path to a stable placement."  <u>Adoption of
Willow</u>, 433 Mass. 636, 647 (2001).  In <u>Adoption of Willow</u>, the
department's goal was to reunite the children with the father,
after the mother was found unfit.  <u>Id</u>. at 643.  The mother
argued that the judge lacked the authority to terminate her

parental rights if he did not also terminate the rights of the father.  Id.  The court concluded that the judge did not err in finding that even though the children had already gone to live with the father, terminating the mother's parental rights served the best interests of the children because "severing all legal relations between the mother and the children . . . is a critical step in promoting stability in their lives."  Id. at 647.

Termination also protects a child from attempts by a parent "to interfere with the child[], initiate multiple, repetitious litigation," and hinder "the child['s] path to a stable placement" (citation omitted).  Adoption of Willow, 433 Mass. at 647.  These same considerations support the judge's decision here to terminate the mother's parental rights notwithstanding Xaden's placement with his father in Pennsylvania.  And because the judge found that posttermination visitation with the mother served Xaden's best interests, termination of the mother's parental rights here does not preclude Xaden and the mother from maintaining a relationship.

Xaden argues that termination will harm his relationship with the mother and possibly interfere with his economic interests, such as his ability to receive child support payments and his eligibility for health insurance through the mother. The judge determined, however, as to all of the mother's

children, that their "future security and welfare far outweigh [the mother's] custody rights." The judge noted, for example, that the "[m]other has failed to address her mental health, anger management, and substance abuse issues, continuing to ignore its impact on the welfare of her children." The evidence supports the judge's decision, and we conclude that she did not abuse her discretion in terminating the mother's parental rights to Xaden.[5]

3. Adoption placement of the younger children. The mother and the father of the younger children argue that the judge erred in approving the adoption plan for the younger children, because there was insufficient evidence that the preadoptive family, their foster family at the time of trial, was a suitable placement for them and the judge failed to meaningfully consider the alternative placement options. Specifically, they claim that the judge did not consider sexualized behaviors that Xaden exhibited while he was also living at the preadoptive family home. The mother also argues that the preadoptive mother failed to meet Xaden's educational and emotional needs because she did not allow him to resume attending in-person school in September and October 2020 due to concerns over exposure to COVID-19.

---

[5] The mother challenges several of the judge's factual findings as clearly erroneous. We have reviewed each of her arguments and discern no clear error.

Finally, the mother claims that the preadoptive mother interfered with the relationship between the mother and the children by not allowing in-person visits.

"We review the judge's placement determination for abuse of discretion." Adoption of Zak, 87 Mass. App. Ct. 540, 545 (2015), S.C., 90 Mass. App. Ct. 840 (2017). "In choosing among placement plans, it falls to the sound discretion of the trial judge to determine what is in the best interests of the child, and our review on appeal is one of 'substantial deference.'" Adoption of Bianca, 91 Mass. App. Ct. 428, 434 (2017), quoting Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999).

While we recognize that the mother and the father of the younger children may have disagreed with the preadoptive mother's educational decisions and her manner of dealing with Xaden's behavioral issues, they have not articulated how these concerns warrant disturbing the judge's approval of the placement of the younger children in the preadoptive home. At the time of trial, Xaden no longer lived with the preadoptive family, and the judge made detailed findings supporting her decision to approve the placement of the younger children with the family. She found that the younger children "have a close bond" with the family and that they live in "a structured household which offers the children love, nurture, safety, and

consistency." The judge also found that the younger children benefit from "receiv[ing] services in the home to address their needs" and from the preadoptive family's ability to "provide permanency for [them]."

We disagree with the father of the younger children's general unsupported allegations that the children are unhappy and that there is no evidence of affection between the preadoptive mother and those children. We find ample support for the judge's findings that the younger children are doing well with the preadoptive family and that they "would suffer harm if removed from their current foster home." Arlo has received support managing his attention deficit hyperactivity disorder, allowing him to focus more easily and to control his impulses. Beth's mood and behavior have also stabilized, and she was able to adjust to a new daycare center without any issues. Laura's social and communication skills have progressed at preschool, and she does well with structure and consistency. Susan, who joined her siblings with the preadoptive family in 2021, has adjusted well to the new placement and has a happy, smart, and playful disposition. We conclude that there were sufficient facts to support the judge's finding that the plan of

adoption by the preadoptive family is in the younger children's best interests.[6]

The mother also suggests that the judge did not sufficiently consider the alternative adoptive placement option for Susan, Laura, and Beth to live with a prior foster mother. The judge expressly concluded, however, that adoption by the prior foster mother would not serve the younger children's best interests. Although it would have been better had the judge explained her reasoning in more detail, the evidence, which the judge was in the best position to weigh, supported her conclusion. Most significantly, the prior foster mother testified that she wanted to adopt only Susan, Laura, and Beth, but not Arlo. Because the judge found the fact that the four younger children would be living together as a positive feature of the placement with the preadoptive family, it is implicit that she also found it would not be in the children's best interest if three of them lived with the prior foster mother and one lived in a separate, unidentified home. There was no abuse of discretion. See Adoption of Ilian, 91 Mass. App. Ct. 727, 732 (2017).

---

[6] Because the judge did not abuse her discretion in approving the adoption plan, we decline the request by the father of the younger children to vacate the decrees terminating his parental rights on this basis.

Conclusion.  The decrees terminating the parental rights of the mother and the father of the younger children are affirmed. The appeal by Xaden's father is dismissed as moot.

So ordered.