KNOX, ADOPTION OF, 102 Mass. App. Ct. 84

 
 ADOPTION OF KNOX. [Note 1]

102 Mass. App. Ct. 84
 October 7, 2022 - January 6, 2023

Court Below: Juvenile Court, Bristol County
Present: Milkey, Walsh, & Hershfang, JJ.

 

No. 22-P-363.

Department of Children & Families. Adoption, Care and protection. Parent and Child, Care and protection of minor, Custody of minor. Minor, Adoption, Care and protection, Custody, Temporary custody. Practice, Civil, Adoption, Care and protection proceeding, Assistance of counsel, Relief from judgment, Disqualification of judge. Interstate Compact on Placement of Children.

A Juvenile Court judge did not err in concluding that the child could not be returned to the mother, who was residing in New Hampshire, without an existing Interstate Compact on the Placement of Children (ICPC) agreement, where the mother's parental unfitness had been well established, which justified the position of the Department of Children and Families that the child could not be placed with the mother out of State without the support and oversight that an ICPC agreement provided. [88-93]

The judge did not err in denying the mother's motion to recuse him from the second termination of parental rights trial, where the judge's statements about the Interstate Compact on the Placement of Children (ICPC) process reflected legitimate, well-founded concerns that the child not be placed with the mother in New Hampshire without sufficient supports in place (i.e., nothing the judge said about the ICPC issue demonstrated that he had prejudged the facts or was biased against the mother). [93]

There was no merit to the mother's claim that trial counsel provided ineffective assistance for not seeking emergency interlocutory relief from the denial of her motion to recuse, where the motion to recuse was unfounded. [93]

The judge did not abuse his discretion in terminating the mother's parental rights, where the mother's unfitness had been established by the documented role that she played in allowing her son to suffer horrific physical abuse by her boyfriend over a prolonged period of time, and her unfitness was likely to continue for the foreseeable future given the absence of any serious effort to address her issues with a therapist or the child regarding the violence. [93-96]

Petition filed in the Bristol County Division of the Juvenile Court Department on October 29, 2014.

 Page 85 

 The case was heard by Lawrence Moniz, J., and a motion for relief from judgment or a new trial, filed on July 13, 2021, was heard by Michaela C. Stewart, J.

 Warren M. Yanoff for the mother.

 Richard A. Salcedo for Department of Children and Families.

 John P. Dennis for the child.

 MILKEY, J. This case involves the welfare of Knox, born in 2012. After two termination of parental rights trials, a Juvenile Court judge issued a decree that, inter alia, found Knox in need of care and protection, found the mother unfit, reaffirmed permanent custody to the Department of Children and Families (DCF), terminated the mother's parental rights, and approved DCF's adoption plan. [Note 2] Alleging ineffective assistance of counsel, the mother filed a motion for relief from judgment or, in the alternative, for a new trial. After a nonevidentiary hearing, that motion was denied by a different judge (the trial judge having retired). [Note 3] In this consolidated appeal, the mother primarily claims error with respect to the application of the Interstate Compact on the Placement of Children (ICPC), St. 1963, c. 452, § 1. See 110 Code Mass. Regs. § 7.500 (2008). We affirm.

 Background. The judge found, and the trial evidence well supports, that over the course of years, Knox was subjected to significant physical abuse by Wade, [Note 4] a long-term boyfriend of the mother. For example, in 2014 when Knox was just two years old, Wade broke Knox's wrist. The mother also suffered domestic violence both by Wade, and by one of the fathers of her children. Although the mother did not herself physically abuse Knox, she allowed the abuse of him to continue by refusing to separate from Wade and by covering up the abuse. [Note 5] For example, when Knox's injuries were discovered, the mother lied about what had caused them, and about her continued contact with Wade. Sadly, and as with some victims of domestic violence, the mother was directly complicit for years in the horrific abuse that Knox was forced to endure.

 Page 86 

 DCF took custody of Knox on October 29, 2014. [Note 6] The mother waived her right to a temporary custody hearing, and she eventually stipulated to her unfitness. Nevertheless, DCF's goal remained reunification, and by June of 2015, Knox was back in the mother's care, although DCF retained legal custody of him. However, the mother continued her relationship with Wade, concealing it from DCF. In her own words, she was "addicted" to him. Just three months after resuming overnight visits, DCF received reports of renewed physical abuse of Knox and removed him a second time. The mother continued her relationship with Wade while he was incarcerated for his abuse of Knox, and he moved back in with her when he was released from incarceration.

 While Knox resided in foster care, the mother moved to New Hampshire without him. DCF continued its efforts to reunite the family, placing Knox back with the mother in New Hampshire in January of 2017. Before doing so, DCF entered into an agreement with its New Hampshire counterpart, the New Hampshire Division of Children, Youth, and Families (NH-DCYF), pursuant to the ICPC. See Adoption of Warren, 44 Mass. App. Ct. 620, 622-624 (1998). Among other benefits, the ICPC agreement allowed there to be a structure in place through which the placement could be supervised by New Hampshire social workers and through which the mother and Knox could receive NH-DCYF services, while DCF still retained legal custody of Knox. See Custody of Quincy, 29 Mass. App. Ct. 981, 982 (1990) ("when a child who is the subject of an ongoing care and protection case is placed with the agreement and participation of Massachusetts in another State, the [ICPC] should be followed to insure that services and treatment continue until they are determined to be no longer necessary").

 As with DCF's earlier effort at reunification, the second attempt promptly failed because of continued abuse of Knox by Wade. Specifically, Knox was found to have suffered head injuries caused when Wade kicked him in the face. The mother again lied to DCF about the cause of the injuries, but later admitted the truth during her testimony at the first termination trial.

 After the New Hampshire placement with the mother failed, Knox eventually was placed with a family in Florida who planned 

 Page 87 

to adopt him. Knox's placement with this preadoptive couple, relatives of Knox's father, was subject to an ICPC agreement between DCF and its Florida counterpart. Thereafter, the first termination trial proceeded, commencing on April 22, 2019, and continuing over nonconsecutive days until June 17, 2019. However, just as the first trial was ending, the Florida placement was falling apart. A close reading of the record suggests that the judge was reluctant to terminate the mother's parental rights without a stable placement, even though he found that she was unfit. Accordingly, the judge deferred a decision on whether to terminate her rights until a later date. See Adoption of Carlos, 413 Mass. 339, 350-351 (1992).

 In his findings following the first trial, the judge addressed an emerging complication related to the ICPC and any potential New Hampshire placement. Although DCF's placement goal by then had changed to adoption, it continued to explore reunification with the mother as part of its "concurrent planning." However, with the attempt to reunite Knox with the mother in New Hampshire having failed in such dramatic fashion, NH-DCYF closed its case involving Knox and stated its intent not to enter into any new ICPC agreement with DCF absent a strong showing that the mother had turned her life around and could keep Knox safe. DCF made repeated efforts to forge a new ICPC agreement with NH-DCYF, including obtaining a Massachusetts court order to facilitate the process, but was rebuffed each time. This created a conundrum: although DCF was still willing to consider placing Knox with the mother, and to help facilitate that placement, it would not do so without NH-DCYF's entering into an ICPC agreement, which NH-DCYF was unwilling to do. In his initial set of findings, the judge stated that NH-DCYF's refusal "impeded any progress toward any plan of reunification between [Knox] and [the m]other [and that] [the m]other was aware of this refusal and how it impacted reunification, while she lived in New Hampshire, but [the] mother made no effort to return to living in Massachusetts, which would have obviated the need for an ICPC or further New Hampshire DCYF involvement." [Note 7]

 At a December 2019 lobby conference that immediately preceded the second termination trial, the judge brought up the ICPC 

 Page 88 

issue again in the same manner as he had done before, once again suggesting that the mother could further potential reunification with Knox by moving back to Massachusetts. [Note 8] This prompted the mother to file a motion for the judge to recuse himself on the ground that he already had prejudged the facts of the case. The judge denied that motion and thoughtfully explained his reasoning from the bench in five pages of transcribed comments.

 The second termination trial commenced on December 16, 2019, and -- delayed by the onset of the COVID-19 pandemic -- continued over nonconsecutive days until June 30, 2020. During this period, Knox lived in Maine with a cousin of the mother and that cousin's spouse, a placement that required yet a third ICPC agreement. By the end of the second trial, the Maine foster parents wished to adopt Knox, and he desired to be adopted by them. The judge found that the mother's unfitness would continue for the indefinite future. He also found that Knox was thriving in the care of his Maine foster parents, and that his best interests would be served by being adopted by them. At the same time, in recognition of Knox's continued bond with the mother, the judge ordered posttermination visitation and strongly encouraged postadoption visitation, which he left to the "sole and exclusive discretion [of the adoptive parents] once the adoption ha[s] occurred."

 Discussion. 1. ICPC issues. The mother makes three arguments based on the judge's statements about the need to comply with the ICPC. First, she argues that the judge committed legal error in concluding that Knox could not be returned to her in New Hampshire without an existing ICPC agreement. Second, she argues that the judge erred in denying her motion to recuse him from the second trial, because he had prejudged whether Knox could be returned to her in New Hampshire. Third, she argues that trial counsel should have sought emergency interlocutory relief pursuant to G. L. c. 231, § 118, first par., from the denial of the mother's motion to recuse and that the failure to do so constituted ineffective assistance of counsel. We address these arguments in order.

 a. Whether an ICPC agreement with New Hampshire was required. The ICPC provides an administrative structure through which a child welfare agency, such as DCF, can place a child in 

 Page 89 

a different State while ensuring that such placement is adequately screened, supervised, and supported. In this manner, the ICPC provides such agencies additional means to protect the interests of children in need of care and protection, even when those children are transferred out of State. While providing agencies such additional authority, however, the ICPC also limits their authority in some respects. Specifically, where the agency seeks to transfer a child out of State "for placement in foster care or as a preliminary to a possible adoption," the "sending agency" is required to comply with various procedural requirements, and the child may not be transferred "until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." St. 1963, c. 452, § 1.

 The mother argues that, by its express terms, the just-quoted language from the ICPC does not apply because DCF's placement of Knox with her, a parent, would not be "for placement in foster care or as a preliminary to a possible adoption." We agree that the language, by its terms, does not speak to the mother's situation, but this is not the end of the inquiry. The mother appears to assume that if the statutory limitation on DCF's authority to transfer children to other States does not apply, it necessarily follows that the mechanisms created by the ICPC cannot be invoked. This is not correct. The fact that the ICPC itself does not require that there be an ICPC agreement in place hardly means that DCF, or a judge, could not require this in appropriate circumstances. Put differently, the statute provides a floor of protection, not a ceiling.

 In fact, DCF has promulgated regulations that require there to be an ICPC agreement in place even in some situations where the statute itself does not do so. Specifically, one such regulation, applicable here, requires ICPC compliance with respect "to any stay across state borders whenever the sending agency requests a home study or supervision of a child by the receiving state." 110 Code Mass. Regs. § 7.503(8) (2008). This regulation has the force of law, and is "presumptively valid and 'must be accorded all the deference due to a statute'" (citation omitted). Pepin v. Division of Fisheries & Wildlife, 467 Mass. 210, 221 (2014). Of course, DCF's regulations may not exceed the scope of authority delegated to the agency under the ICPC or other child welfare statutes, but the mother has not challenged DCF's regulations as 

 Page 90 

ultra vires. [Note 9]

 Existing case law supports our conclusion that DCF can, in some circumstances, apply the protective structures created by the ICPC to out-of-State, noncustodial parents. In Custody of Quincy, we endorsed the application of the ICPC to a placement of a child with an out-of-State parent where there was a need for supports that, as a practical matter, only compliance with the ICPC could provide. See Custody of Quincy, 29 Mass. App. Ct. at 981-982 (without addressing whether ICPC agreement was legally required, concluding that in accordance with "customary" practice, DCF's predecessor "should" have entered into ICPC agreement with New Hampshire before child was sent to live there with parent so that services and treatment could have been made available). Subsequently, in Adoption of Warren, 44 Mass. App. Ct. at 623-624, we rejected an argument that the ICPC could not be applied to the placement of a child with an out-of-State parent, albeit without addressing the specific statutory language on which the mother now relies. [Note 10] In doing so, we specifically relied on the regulation also applicable to the case before us. Id. at 624, citing 110 Code Mass. Regs. § 7.503(8) (1993).

 Recognizing that DCF can, in some circumstances, apply the ICPC to the placement of a child with an out-of-State, noncustodial parent also is necessary to serve the protective ends that the ICPC and other child welfare statutes were designed to 

 Page 91 

foster. [Note 11] As one court in another jurisdiction aptly stated: "Once a court has legal custody of a child, it would be negligent to relinquish that child to an out-of-state parent without some indication that the parent is able to care for the child appropriately." Department of Children & Families v. Benway, 745 So. 2d 437, 439 (Fla. Dist. Ct. App. 1999). [Note 12]

 We now turn from this background law back to the case at hand. We discern no error in the judge's apparent acceptance of DCF's position that an ICPC agreement with New Hampshire was required here before Knox could be returned to the mother in New Hampshire. [Note 13] DCF had legal custody of Knox, and the mother's parental unfitness had been established (first by stipulation and then by the judge after the first termination trial). This 

 Page 92 

amply justified DCF's position that Knox could not be placed with the mother in New Hampshire without the support and oversight that an ICPC agreement could offer. [Note 14] Put differently, under the circumstances of this case, it would have been highly imprudent -- at a minimum -- to return Knox to New Hampshire without the support and oversight that an ICPC agreement would provide. [Note 15]

 None of this is to dispute the mother's point that had the judge found her fit, he theoretically could have returned Knox to her without the existence of an ICPC agreement. As is well-illustrated by the facts of this case, however, the practical reality is that determinations of fitness and adherence to ICPC procedures are often bound up together. On this record, we discern no error in the judge's acceptance of DCF's decision to invoke the ICPC process with respect to placing Knox with the mother in New Hampshire.

 Even if we were to conclude that the judge failed to perceive that there was a theoretical pathway through which Knox could be sent to New Hampshire without requiring compliance with the ICPC, the mother has not shown that this oversight caused her sufficient prejudice to warrant a third termination trial. To be sure, the judge did fault the mother for not seeking to remove the ICPC "impediment" by moving back to Massachusetts, which he interpreted as yet another example of the mother placing her own needs above those of Knox. But far from resting his findings on this basis, the judge disclaimed that he was "motivated in any way by 'punishment' of [the] mother for not moving to Massachusetts." Furthermore, he expressly stated that her decision to 

 Page 93 

stay in New Hampshire "has not been a sole or determinative factor," and that he considered it merely "as part of the constellation of evidence." Rather, his chief consideration was the mother's demonstrated inability to provide Knox a safe and stable home. Evidence of this was abundant.

 b. Recusal. We turn next to the mother's argument that the judge erred by denying her motion to recuse. Even if the judge's understanding of the ICPC had been incorrect, this would not have meant that he exhibited personal bias that required his recusal. From the judge's perspective, his suggestion that the mother consider moving back to Massachusetts was likely an effort at creative problem-solving to address the refusal by NH-DCYF to engage with DCF to facilitate a placement in New Hampshire. Nothing the judge said about the ICPC issue demonstrated that he had prejudged the facts or somehow was biased against the mother. See Erickson v. Commonwealth, 462 Mass. 1006, 1007 (2012), quoting Commonwealth v. Daye, 435 Mass. 463, 470 n.4 (2001) (recusal not warranted where no showing that judge "was biased . . . or that his ruling was 'influenced by any considerations other than the law'"). In this regard, it is important to keep in mind that the judge already had determined the mother to be unfit in the first trial; the purpose of the second trial was to determine whether her unfitness continued and where Knox's best interests lay based on any new developments. We interpret the judge's statements about the ICPC process as reflecting legitimate, well-founded concerns that Knox not be placed with the mother in New Hampshire without sufficient supports in place. The judge did not err in denying the mother's motion to recuse.

 c. Ineffective assistance of counsel. Because the motion to recuse was unfounded, a petition seeking interlocutory relief from the denial of that motion stood no reasonable chance of success (especially in light of the highly deferential standard of review that any single justice would have applied). Trial counsel therefore cannot be faulted for failing to file such a petition. See Commonwealth v. Comita, 441 Mass. 86, 90-91 (2004) (failure to pursue litigation path that was unlikely to succeed cannot amount to ineffective assistance). Accordingly, the second judge did not err in denying the motion for a new trial.

 2. Fitness and termination. In addition to the ICPC issues, the mother argues that the judge's finding of unfitness and his decision to terminate the mother's rights lack adequate support in the 

 Page 94 

record. She challenges only one of the hundreds of subsidiary findings, specifically finding no. 10, that the mother had not disclosed key information to her therapist, including Knox's history of abuse by Wade and her role in that abuse, and that the therapist learned this background only from a DCF social worker. There was testimony to support the judge's finding on this matter, and it was not clearly erroneous. See Adoption of Paula, 420 Mass. 716, 729 (1995) (subsidiary findings must be accepted unless clearly erroneous).

 The mother also argues that the subsidiary findings, taken together, do not constitute clear and convincing evidence of the mother's unfitness. See Adoption of Ilona, 459 Mass. 53, 59 (2011). We disagree.

 The mother's unfitness was established by the well-documented role that she played in allowing Knox to suffer horrific physical abuse over a prolonged period of time. See Custody of Vaughan, 422 Mass. 590, 595 (1996) ("physical force within the family is both intolerable and too readily tolerated, and . . . a child who has been either the victim or the spectator of such abuse suffers a distinctly grievous kind of harm"). A somewhat closer question is whether the mother's unfitness was only temporary, or whether it would continue for the foreseeable future. See Adoption of Varik, 95 Mass. App. Ct. 762, 773-774 (2019) (where "serious . . . risk of harm . . . would not be remedied in the foreseeable future, . . . that justified the termination of . . . parental rights"). Critically, however, the mother was given multiple opportunities over the course of years to demonstrate that she could provide Knox a safe and stable home, and she failed to do so.

 This decidedly is not a case where the judge failed to confront "troublesome facts." See Adoption of Stuart, 39 Mass. App. Ct. 380, 382 (1995) ("Troublesome facts . . . are to be faced rather than ignored" [citation omitted]). The judge recognized that the mother did participate in some services and that "there [was] no evidence [that] any domestic violence has been perpetrated on [the] mother or in the home since April, 2017." He went on to explain, however, why he concluded that the mother had not sufficiently addressed her shortcomings. For example, the judge found that the "mother has not taken steps to ensure [Knox] of his sense of safety and stability, and by withholding information from [her therapist] and social worker, she has failed to equip herself to deal with his fears." The judge was entitled to draw such conclusions. Indeed, even where there has been no 

 Page 95 

documented history of neglect or abuse, a "judge was not bound to wait for a disaster to happen if that seemed close to inevitable . . . [as] [h]e could use past conduct, medical history, and present events to predict future ability and performance as a parent." Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998). Where, as here, there is a long history of actual physical abuse against Knox while in the mother's care, the need for protective action is even clearer. We discern no error in the judge's concluding that, without any serious effort by the mother to address her issues with a therapist or the child regarding violence, the mother's unfitness was likely to continue for the foreseeable future. [Note 16]

 The mother is, of course, correct that "[u]nfitness does not mandate a decree of termination." Adoption of Imelda, 72 Mass. App. Ct. 354, 360 (2008). However, it is unfair to leave a child in limbo indefinitely. See Adoption of Nancy, 443 Mass. 512, 517 (2005). As time passes, it becomes increasingly important that a child obtain a stable, safe, and nurturing home environment. Even if the mother had shown promising efforts at the time of trial, "it is only fair to the child[] to say, at some point, 'enough.'" Id. The judge did not abuse his considerable discretion in concluding that that point had been reached in this case.

 Knox was removed from the mother's custody in 2014 when he was only two years old. He has lived with the mother for a total of approximately six months since then, during which he continued to be terrorized by Wade. Knox is now ten years old. Following many years of what the judge aptly described as "this child's tortured history of no stability in his life," Knox was thriving in a kinship placement that offered him the potential permanency and peace that he deserves. See Adoption of Bianca, 91 Mass. App. Ct. 428, 433 (2017) (recognizing that children have "fundamental human right 'to live in physical security, free 

 Page 96 

from fear that brute force will determine the conditions of one's daily life'" [citation omitted]).

 In the end, "[w]hile courts protect the rights of parents, the parents' rights are secondary to the child's best interests and . . . the proper focus of termination proceedings is the welfare of the child" (quotation and citation omitted). Adoption of Ilona, 459 Mass. at 61. With the overarching "best interests" standard in mind, we discern no abuse of discretion or other error in the judge's decision to terminate the mother's parental rights as to Knox.

 Decree affirmed.

 Order denying motion for a new trial affirmed.

FOOTNOTES
[Note 1] A pseudonym. 

[Note 2] The father of Knox was also found unfit and his parental rights were terminated. He has not appealed. 

[Note 3] We refer hereafter to the trial judge as "the judge" and to the judge that heard the motion for a new trial as "the second judge." 

[Note 4] A pseudonym. 

[Note 5] The mother was criminally charged for her conduct, although that charge eventually was dismissed. 

[Note 6] Knox's older half-sister also was subject to DCF's care and protection petition, and she was removed at the same time as Knox. After the half-sister's father gained legal custody of her, DCF dismissed its care and protection petition with respect to her. Although the half-sister's father apparently still retains legal custody of her, she now lives part time with the mother. 

[Note 7] At the time, the mother had just given birth to a second daughter, who was living with her. Knox's older half-sister also was staying with the mother several days per week. On appeal, counsel has suggested that the mother's reluctance to move back to Massachusetts was due to her fear that DCF would take custody of her daughters. 

[Note 8] The lobby conference was not recorded, but the judge characterized what was said immediately when he returned to the bench. Neither then, nor now, has the mother challenged the judge's recounting of what occurred at the conference. 

[Note 9] While not arguing that the regulation is ultra vires, the mother does contend that by effectively conditioning custody on her moving back to Massachusetts, the judge unconstitutionally interfered with her right to live in the State of her own choosing. We are unpersuaded. For one thing, application of the ICPC to parents who have moved out of State does not discriminate against such parents; instead, it merely seeks to ensure that they will receive the same supports and oversight that would be in place had they remained in the Commonwealth. For another, even in child custody cases involving private parties, in which parental fitness is seldom at issue, the case law has long recognized that the parent's authority to remove a child from the Commonwealth is constricted by the overarching consideration of the child's best interests. See, e.g., Prenaveau v. Prenaveau, 75 Mass. App. Ct. 131, 138-140 (2009), and cases cited. 

[Note 10] The parent in Adoption of Warren argued that DCF was expressly prohibited from applying the ICPC by certain other language in the ICPC. That language stated that the ICPC "shall not apply to . . . [t]he sending or bringing of a child into a receiving state by his parent, [certain other relatives], or his guardian and leaving the child with any such relative or non-agency guardian in the receiving state." Adoption of Warren, 44 Mass. App. Ct. at 623, quoting St. 1963, c. 452, § 1. 

[Note 11] For a recent government report discussing the role that the ICPC plays in protecting children in need of care and protection, see Office of the Child Advocate, Investigative Report: A Multi System Investigation Regarding Harmony Montgomery at 80, 83 (May 2022), https://www.mass.gov/doc/office-of-the-child-advocate-investigative-reportharmony-montgomerymay-2022/download [https://perma.cc/M82J-DQU3]. 

[Note 12] States across the country have adopted reciprocal statutes codifying the ICPC. This has led to a great number of cases examining the extent to which the ICPC can be applied to out-of-State, noncustodial parents. Many jurisdictions have held that the ICPC can apply to such parents, at least in some circumstances. See D.S.S. v. Clay County Dep't of Human Resources, 755 So. 2d 584, 590 (Ala. Civ. App. 1999); Arizona Dep't of Economic Sec. v. Leonardo, 200 Ariz. 74, 83 (Ct. App. 2001); Green v. Division of Family Servs., 864 A.2d 921, 927-928 (Del. 2004); Department of Children & Families v. C.T., 144 So. 3d 684, 685-686 (Fla. Dist. Ct. App. 2014); K.D.G.L.B.P. v. Hinds County Dep't of Human Servs., 771 So. 2d 907, 913 (Miss. 2000); State ex rel. Juvenile Dep't of Clackamas County v. Smith, 107 Or. App. 129, 132 n.4 (1991); In re J.H., 156 Vt. 66, 67-68 (1991). A similar number of other jurisdictions have come to the opposite conclusion. See McComb v. Wambaugh, 934 F.2d 474, 479-482 (3d Cir. 1991); Arkansas Dep't of Human Servs. v. Huff, 347 Ark. 553, 563-564 (2002); In re C.B., 188 Cal. App. 4th 1024, 1026 (2010); In re Emoni W., 305 Conn. 723, 734-735 (2012); In re D.B., 43 N.E.3d 599, 604 (Ind. Ct. App. 2015); In re S.R.C.-Q., 52 Kan. App. 2d 454, 464 (2016); A.G. v. Cabinet for Health & Family Servs., 621 S.W.3d 424, 432 (Ky. 2021); In re R.S., 470 Md. 380, 403-410 (2020); In re Alexis O., 157 N.H. 781, 788, 791 (2008); Matter of D.L. v. S.B., N.Y. Ct. App., No. 22 N.Y. Slip Op. 05940 (Oct. 25, 2022); In the Interest of C.R.-A.A., 521 S.W.3d 893, 904, 907 (Tex. Ct. App. 2017); Matter of Dependency of D.F.-M., 157 Wash. App. 179, 189-190 (2010). 

[Note 13] It is not entirely clear that the judge in fact ruled that an ICPC agreement was legally required. It may be that he simply was saying that such an agreement "should" be obtained. Nevertheless, we agree with the mother that the judge's statements about the need for an ICPC agreement can be interpreted as saying that an ICPC agreement was legally required, and we thus assume that he came to that conclusion. 

[Note 14] We emphasize that our ruling arises in circumstances where DCF had legal custody of the child and the out-of-State parent seeking custody was the one whose fitness was at issue in the care and custody proceeding. We do not address the extent of DCF's authority to require compliance with the ICPC in other circumstances, e.g., where the fitness of the out-of-State parent seeking custody has not been called into question. 

[Note 15] The mother points out that the judge commented that "[t]his court is satisfied that had [the] mother been in Massachusetts, subject to appropriate DCF oversight, and with all other factors being the same, the child would have been placed with her while in DCF custody." According to the mother, that statement "essentially acknowledged [her] current parental fitness." We disagree. Viewed in context, the judge's quoted statement was not a conclusion that the mother had regained her fitness, but appears instead nothing more than his observation that -- faced with few viable alternatives -- DCF might well have tried placing Knox with the mother one more time if this placement could have been supervised. 

[Note 16] As we previously have stated: 

"We pause to note that the mother has shown evident affection toward [the child], and none of the judge's findings negate this. Despite the moral overtones of the statutory term 'unfit,' the judge's decision was not a moral judgment or a determination that the mother . . . do[es] not love the child. The inquiry instead is whether the parent['s] deficiencies or limitations 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.'"

Adoption of Bianca, 91 Mass. App. Ct. 428, 432 n.8 (2017), quoting Care & Protection of Bruce, 44 Mass. App. Ct. at 761.

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.