SUPREME JUDICIAL COURT 
 
 CARE AND PROTECTION OF ADELE [1]

 
 Docket:
 SJC-13601
 
 
 Dates:
 January 6, 2025 – April 23, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Wolohojian, JJ.
 
 
 County:
 Essex
 

 
 Keywords:
 Minor, Care and protection. Parent and Child, Care and protection of minor. Practice, Civil, Care and protection proceeding, Record, Recording of proceedings. Impoundment. Uniform Rules on Impoundment Procedure. Department of Children & Families. Juvenile Court.
 
 

             Petition filed in the Essex County Division of the Juvenile Court Department on August 12, 2014.
            A motion for access to audio recordings of court proceedings, filed on April 10, 2023, was heard by Kerry Ahern, J., and a motion for reconsideration was considered by her.
            The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.
            Jennifer M. Lamanna for LCMedia Productions, Inc.
            Kristin S. Braithwaite for Department of Children and Families.
            Andrew Hoffman for the mother.
            Lily Lockhart, for the child, was present but did not argue.
            Jay D. Blitzman, pro se, amicus curiae, submitted a brief.
            Bruce D. Brown, for Reporters Committee for Freedom of the Press & others, amici curiae, submitted a brief.
            WENDLANDT, J.  Much has been publicized about the tragic circumstances of the short life of the child at the center of this controversy.  After a Juvenile Court judge (first judge) awarded custody of the child to her father, a New Hampshire resident, she went missing.  She was five years old and had previously spent most of her life in foster care; the Department of Children and Families (department) had removed her from her mother's care when she was two months old, following reports of neglect.
            Prior to the award of custody to the father, the department requested that the Division for Children, Youth and Families (New Hampshire DCYF) conduct a home study of the father's New Hampshire home under the Interstate Compact on the Placement of Children (ICPC); although the first judge stayed the custody order pending receipt of the ICPC report, and despite the order of a different Juvenile Court judge (second judge) that the ICPC report be expedited, no report was received.  Nonetheless, after a brief delay, the father was allowed to take custody of the child.
            Little is known about the child's circumstances in the wake of her move to New Hampshire with her father.  More than two years after the father gained custody, the New Hampshire DCYF learned that her whereabouts were unknown; and eventually, the Manchester, New Hampshire, police department commenced search efforts.  The child's body has not been found; she is presumed dead, and her father has been convicted of her murder.
            Following widespread publicity in the aftermath of the child's disappearance and concerns raised regarding the handling of the child's care and custody by authorities in Massachusetts and New Hampshire, the Office of the Child Advocate (OCA), a Commonwealth agency charged with investigating the "quality of services and supports" received by children in the Commonwealth's care, G. L. c. 18C, § 2, conducted an inquiry.[2]  The OCA issued a report of its findings in which the agency disclosed many, but not all, of the details of the lives of the mother, the father, and the child that were discussed during the course of the care and protection proceeding.
            In this case, a journalist sought access to one aspect of the care and protection proceedings for use in a documentary examining the child welfare and foster care systems; specifically, the journalist requested the audio recordings of hearings that culminated in the award of the child's custody to the father in February 2019.  Such materials are impounded by statute.  See G. L. c. 119, § 38.  The second judge denied the request, after applying Rules 7 and 11 of the Uniform Rules on Impoundment Procedure (2015) (URIP).
            We agree with the second judge that the proper rubric for determining whether to allow access to the statutorily protected records is the good cause standard set forth in Rule 7(b) of the URIP.  However, we conclude that, in light of the circumstances of this case, the judge erred in her application of the rule.
            We have ordered and listened to audio recordings of the February 2019 hearings.  For the reasons stated in this opinion, we conclude that the journalist has demonstrated good cause for the release of those recordings to him for use in the documentary.  We vacate the order of the second judge denying the journalist's motion and order the release of the February 2019 hearing recordings to the journalist for that limited purpose, subject to the redactions we identify here[3] and to the conditions for the recordings' use that the journalist himself proposed, which we identify infra.[4]
            1.  Background.  a.  Facts.  The audio recordings at issue concern a child born in the Commonwealth in 2014.  See Office of the Child Advocate, Investigative Report 13 (May 2022).  Upon the child's birth, her mother had sole custody; her father was incarcerated.  Id.  The child was born blind in one eye and with other medical ailments.  Id.  Accordingly, she received early intervention services from the Department of Public Health until age three.  Id.  She also received special education services from her school district while she lived in the Commonwealth.  Id.
            The department intervened in the child's life almost immediately.  The month she was born, the department received several allegations of neglect and began providing services to the mother and the child.  Id.  In August 2014, following additional reports of neglect and substance abuse by the mother, the department filed a care and protection petition in the Juvenile Court, was granted temporary custody, and removed the child to a foster home.  Id.  In July 2015, a Juvenile Court judge found that the child was in need of care and protection and that both parents were unfit.  Id. at 15, 88.  The judge also awarded the department "permanent"[5] custody of the child.  Id. at 15.
            Between January 2015 and February 2019, the department returned the child to her mother's physical custody twice during periods of the mother's compliance with conditions set by the department that she receive treatment for her substance use disorder; each time, however, the mother succumbed to her substance use disorder, and the child was returned to foster care.[6]  Id. at 14, 17, 19, 91.
            The department provided the father -- who was still incarcerated -- with an action plan in September 2014, shortly after the child was placed into foster care for the first time.  Id. at 14.  Pursuant to the plan, the father was required to complete classes in parenting, substance use disorder, and anger management, and to gain an understanding of the child's medical needs.  Id.  The father did not engage with the department until December 2014.  Id.  In January 2015, the father met the child for the first time during a supervised visit at the prison.  Id.
            The father had no contact with the department or the child between July 2015, when the department arranged a second supervised visit in prison, and September 2016, when he reinitiated contact with the department.[7]  Id. at 15, 16.  During the autumn of 2016, the father reported to the department that he was living with his then girlfriend in New Hampshire, was sober and attending substance use disorder treatment, and was working full time.  Id. at 16-17.  Although he canceled several scheduled visits, the father had supervised visits with the child at least monthly between October 2016 and February 2017.  Id.
            In February 2017, the department changed its permanency goal for the child from adoption to reunification with the mother; around the same time, the father ceased responding to the department.  Id. at 17-18.  Although he was not in contact with the department for several months, the father maintained contact with the child, including through several overnight visits.  Id. at 18.  These visits were permitted by the mother but not approved or supervised by the department.  Id.
            After restoring contact with the department in September 2017, the father had a supervised visit with the child.  Id.  At that time, the father provided the department with documentation of his sobriety and treatment, and signed releases permitting the department to verify his housing and employment status.  Id.  The father also informed the department that he had completed parenting and anger management classes in 2015 while in prison.  Id. at 18 & n.18.  The department instructed him to complete additional department-approved parenting and anger management classes.  Id. at 18.  Despite the department's offers for additional supervised visits, the father did not visit with the child again until August 2018.  Id.
            Between August 2018 and February 2019, the father attended eleven supervised two-hour visits with the child.  Id. at 19-20.  According to the department's case managers, the father was attentive to the child, but "sometimes did not have age-appropriate expectations or responses to her."[8]  Id. at 17.  See id. at 19, 20, 25-26.
            In October 2018, the father moved for a review and redetermination hearing and sought legal custody of the child.[9]  Id. at 19.  His hearing was scheduled for February 2019.[10]  Id.  In December 2018, the department's foster care review panel determined, for the first time, to pursue permanently placing the child with the father.  Id. at 19-20.  This shift was based on the panel's determination that the father had maintained consistent communication and cooperation with the child's department case team since August 2018.  Id.  The panel set a projected placement date in December 2019.  Id. at 20.  The panel also required the father to participate in a home study[11] under the ICPC[12] before he could gain custody of the child.  Id. at 20, 29.  In December 2018, the second judge ordered that the ICPC report be expedited.  Id. at 20.
            In February 2019, the first judge held the father's review and redetermination hearing; counsel for the mother attended, but the mother was not in court because of a scheduling conflict with a separate care and protection proceeding concerning a different child.  Id. at 20, 35.  At the time of the hearing, the New Hampshire ICPC compact administrator[13] had not returned the ICPC report.  Id. at 20-21.  The department opposed placing the child with her father, at least until the ICPC report was completed.[14]  Id. at 37.  Following testimony from the father and a social worker assigned to the child's case, the first judge determined that the father was not an unfit parent and should be awarded custody.  Id. at 21, 35-36, 47.  The judge also noted his understanding that New Hampshire courts did not apply the ICPC to placements of children with their parents.  Id. at 21, 50, 53.  See In re Alexis O., 157 N.H. 781, 790-791 (2008).
            The first judge stayed his orders granting custody to the father and dismissing the case, however, because he was concerned that the father might face difficulty obtaining services for the child if the New Hampshire DCYF or courts did not recognize the father's custody.  Office of the Child Advocate, at 52-53.  Two weeks later, the first judge noted that the New Hampshire ICPC compact administrator had "received and acknowledged" his custody order and order dismissing the care and protection proceeding.  Accordingly, the judge vacated the stay and ordered the department to "facilitate the reunification of [the father] with his daughter."  The department did not appeal from the judge's custody decision.  Id. at 21.
            The father moved the child to New Hampshire in February 2019.  Id.  By December 2019, the child apparently had disappeared, although it was not until nearly two years later that New Hampshire DCYF first learned she was missing.  Id. at 7.  In November 2021, the mother contacted the Manchester, New Hampshire, police department to report that she had not seen the child since April 2019.  Id.  The following month, after the New Hampshire DCYF determined that it could not locate the child, the Manchester police department publicly announced her disappearance and its search for her.  Id. at 7-8.  Within days of the announcement, the child's disappearance was widely reported in news outlets.  See, e.g., Gavin, Timeline:  What We've Learned from the [Child's] Investigation, Boston.com (Jan. 7, 2022), [https://perma.cc/Y2GR-2DPR]; Arnett & Koh, N.H. Governor Questions Mass. Court's Handling of [Child's] Case, Boston Globe, Jan. 18, 2022, [https://perma.cc/9NAL-YNJJ]; Elamroussi, Alsharif, & Moshtaghian, Governors Express Concern over Handling of Case of Missing 7-year-old Girl and Call for Further Review, CNN (Jan. 20, 2022), [https://perma.cc/537Z-PDVW].
            The story continued to garner attention as New Hampshire prosecutors charged the father and then his wife with numerous offenses relating to the child's disappearance.  See, e.g., [Child's] Case:  New Charges Planned Against Stepmom, Reward at $100k, NBC Boston (Jan. 11, 2022), [https://perma.cc/ML7M-55QK]; Hayes, [Child's] Case:  Hearing Held for Father of Girl Missing Since 2019, Fox10 Phoenix (Mar. 4, 2022), [https://perma.cc
/9XA3-BFVB].  OCA launched an investigation into the Commonwealth's handling of the child's care and custody.  Office of the Child Advocate, at 8.
            Public attention continued.  The OCA's release of its report in May 2022, New Hampshire prosecutors' decision to charge the father with the child's murder in October 2022, and subsequent developments in that criminal case all received widespread attention.  See, e.g., Reale, New Report Blasts Systemic Failure to Care for [Child], GBH News (May 4, 2022), [https://perma.cc/NP5Q-5CCG]; [Child's] Father Pleads Not Guilty to Killing Her, Associated Press (Oct. 25, 2022), [https://perma
.cc/F5JB-MDF3]; Crimaldi & Ellement, Affidavit Reveals New Allegations in the Death of 5-year-old [Child], Boston Globe, June 20, 2023, [https://perma.cc/M82D-W22Q].
            The audio recordings of the Juvenile Court hearings in the child's care and protection proceedings remain impounded and unavailable to the public.  See G. L. c. 119, § 38 (closing hearings concerning care and protection of children).
            b.  Procedural history.  On April 10, 2023, the journalist Bill Lichtenstein, president of LCMedia Productions, Inc., filed a motion in the Juvenile Court seeking access to the audio recordings of four Juvenile Court hearings in the child's care and protection proceedings.  The journalist initially sought access to audio recordings of hearings in August 2014, when the first care and protection hearing occurred; in July 2015, when the mother and the father were both found to be unfit and the department was granted permanent custody of the child; in December 2018, when the second judge ordered an expedited evaluation under the ICPC to consider placing the child with the father; and in February 2019, when custody was awarded to the father.
            Following a nonevidentiary hearing on the motion, the second judge -- who had ordered the expedited ICPC report in December 2018 -- denied the motion.  In his subsequent motion for reconsideration, the journalist narrowed his request to the hearings during which the father was awarded custody.  The second judge denied the motion.  The journalist filed a timely notice of appeal; as he had done in his motion for reconsideration, the journalist, at oral argument, limited his request for access to the audio recordings of the February 2019 hearings.  We transferred the case from the Appeals Court on our own motion.
            2.  Discussion.  a.  Standard for interested nonparties seeking release of impounded records.  We have long recognized that the public has a "common-law right of access to the judicial records of civil proceedings."  Boston Herald, Inc. v. Sharpe, 432 Mass. 593, 605 (2000) (Sharpe), overruled in part on other grounds in Jaynes v. Commonwealth, 436 Mass. 1010 (2002).  See Massachusetts Body of Liberties, art. 48 (1641) ("Every Inhabitant of the Country shall have free libert[y] to search and [review] any Ro[lls], Records, or Reg[i]sters of any Court or office").  We have explained:
"It is desirable that the trial of causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed."
Cowley v. Pulsifer, 137 Mass. 392, 394 (1884).  Accordingly, as a general matter, court records are presumptively public documents.  New England Internet Café, LLC v. Clerk of the Superior Court for Criminal Business in Suffolk County, 462 Mass. 76, 83 (2012).
            This "general principle of publicity," Commonwealth v. Blondin, 324 Mass. 564, 571 (1949), cert. denied, 339 U.S. 984 (1950), however, is not unlimited.  A court, for example, has "inherent equitable power 'to impound its files in a case and to deny public inspection of them . . . when justice so requires'" (citation omitted).  George W. Prescott Publ. Co. v. Register of Probate for Norfolk County, 395 Mass. 274, 277 (1985).  The Legislature also has promulgated statutes that limit public access to court proceedings and records in circumstances where it has determined the principle of publicity must yield to the public policy in favor of preserving the privacy interests of the parties in the proceedings.  See, e.g., G. L. c. 209A, § 8 (records in abuse prevention matters when minor is party); G. L. c. 210, § 5C (adoption petitions and associated court records); G. L. c. 119, § 60A (certain delinquency proceedings).
            Relevant to our present analysis, "[t]he Legislature has determined that care and protection proceedings are impounded and should be closed to the general public to protect the privacy of all of the parties."[15]  Care & Protection of M.C., 479 Mass. 246, 252-253 (2018) (M.C. I), citing G. L. c. 119, § 38.[16]  The closure of care and protection proceedings furthers the Commonwealth's "legitimate interest in protecting children from the stigma that may be associated with having parents who are accused of being unfit, or who have been found to be unfit."  Care & Protection of Sharlene, 445 Mass. 756, 774 (2006) (Spina, J., concurring).  Care and protection proceedings "necessarily involve[] the most intimate details of the parents' and the child's lives."  M.C. I, supra at 255.  Thus, a person seeking access to impounded materials in a care and protection proceeding faces a high hurdle.
            While all proceedings in the Juvenile Court are statutorily impounded, Rule 11 of the URIP provides that "[a]ny party or interested nonparty may file a motion supported by affidavit for relief from impoundment."  Rule 11 of the Uniform Rules on Impoundment Procedure.  Rule 11 does not set forth how such a request for relief from impoundment should be evaluated, but it instructs that "[t]he procedures set forth in these rules shall govern requests for relief from impoundment to the extent practicable."  Id.
            We have concluded that the good cause standard set out in Rule 7(b) of the URIP provides the appropriate test for evaluating requests by the parties or the Commonwealth for access to impounded care and protection proceeding.  See M.C. I, 479 Mass. at 254.  Rule 7(b) provides that, "[i]n determining good cause, the court shall consider all relevant factors, including, but not limited to, (i) the nature of the parties and the controversy, (ii) the type of information and the privacy interests involved, (iii) the extent of community interest, (iv) constitutional rights, and (v) the reason(s) for the request."  Rule 7(b) of the Uniform Rules on Impoundment Procedure.  The good cause standard under Rule 7(b), we explained, "requires a court to 'balance the rights of the parties based on the particular facts of each case.'"  M.C. I, supra, quoting Sharpe, 432 Mass. at 604.
            Because the good cause standard balances the rights of the parties and all other relevant factors based on the particular facts of a case, we now conclude, and the parties agree, that it is the appropriate test for considering the Rule 11 motion of an interested nonparty, like the journalist here, for release of care and protection proceeding records that are otherwise required by statute to be impounded.  See M.C. I, 479 Mass. at 254, quoting Sharpe, 432 Mass. at 604.
            Care and protection proceedings are impounded by statute to protect the privacy interests of the parties.  See G. L. c. 119, § 38.  Accordingly, those interested nonparties who seek "to pierce this veil of privacy . . . bear the burden of demonstrating good cause for release from impoundment."  M.C. I, 479 Mass. at 260.  See Care & Protection of M.C., 483 Mass. 444, 445 (2019) (M.C. II), quoting M.C. I, supra at 248-249 ("the requestor bears the burden of demonstrating that the records should be released under the good cause standard of Rule 7").
            b.  Standard of review.  We review a judge's decision regarding whether good cause for the release of impounded records has been shown for abuse of discretion or other legal error.  New England Internet Café, LLC, 462 Mass. at 83-84.  See M.C. II, 483 Mass. at 452.  "[A] judge's discretionary decision constitutes an abuse of discretion where we conclude the judge made a 'clear error of judgment in weighing' the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives."  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).
            c.  Good cause analysis of February 2019 recordings.  The second judge properly determined that the factors set forth in the good cause standard of Rule 7(b) govern the journalist's requests for access to the impounded care and protection hearing recordings.  However, the second judge did not apply this standard to each of the journalist's tailored requests, instead treating the journalist's requests as seeking disclosure of all the records of the child's care and protection proceeding.  To be sure, care and protection proceedings almost by definition involve highly sensitive information about the intimate details of a family's life; for this reason, impoundment is justified in the majority of cases.  See, e.g., M.C. I, 479 Mass. at 255 (care and protection proceedings "necessarily involve[] the most intimate details of the parents' and the child's lives"); Care & Protection of Sharlene, 445 Mass. at 774 (Spina, J., concurring) (closing care and protection proceedings justified because, inter alia, "[t]he State has a legitimate interest in protecting children from the stigma that may be associated with having parents who are accused of being unfit, or who have been found to be unfit").
            Here, however, the journalist did not seek access to all records of a child's care and protection proceeding from an otherwise confidential case that has garnered no public attention.  Instead, in this high-profile matter involving a child murdered by her father, the journalist sought initially four specific sets of audio recordings and on reconsideration sought only one:  audio recordings of the two February 2019 hearings.  Because the judge did not consider each request on its own merits, she did not engage in the appropriate analysis of how the good cause factors should be applied to the journalist's narrowed request for the February 2019 audio recordings.  This was error.  See M.C. II, 483 Mass. at 452-459 (analyzing separately each request for access to individual records).
            Good cause in this instance can be assessed on the basis of documentary evidence, including the hearing recordings.  See Commonwealth v. Tremblay, 480 Mass. 645, 656 (2018) ("[a] recording is documentary evidence").  Because we are in the same position as the motion judge to review documentary evidence, we proceed to apply the Rule 7(b) factors ourselves.  See Commonwealth v. Yusuf, 488 Mass. 379, 385 (2021) (we "review de novo any findings based entirely on" recorded evidence).  We begin by considering the first two Rule 7(b) factors -- (i) the nature of the parties and the controversy, and (ii) the type of information and the privacy interests involved -- together.  Significantly, the parties who were involved in the February 2019 hearings -- the child (through an appointed representative) and her father -- have not opposed release of the recordings.  The February 2019 hearings focused on the father's fitness as a parent.  The father has asserted no privacy interest in the February 2019 hearings.[17]  The child's counsel took no position on the release; instead, the child's counsel has emphasized that the child's dignity and privacy deserve continued respect.[18]
            The public policy that motivated the Legislature to close care and protection hearings generally concerned protecting children from the "stigma associated with parental unfitness" that a subject child might carry for life.  Care & Protection of Sharlene, 445 Mass. at 775 (Spina, J., concurring).  The February 2019 hearings do not implicate this concern because, tragically, the child is not alive "to suffer any stigma" "associated with parental unfitness."  See id. at 774-775.  Moreover, the details of the child's life and the care and protection proceedings already have been widely disclosed.  See discussion supra.  In this context, any lingering privacy interests that the child might be said to have are greatly diminished as to the February 2019 recordings.
            The mother is the only other party with an interest in the requested audio recordings.[19]  Importantly, the mother was not present at the February 2019 hearings, and the hearings did not concern her fitness as a parent.  Office of the Child Advocate, at 20.  The recordings do not disclose any information about the mother that the OCA's report has not already publicly disclosed.  See id.  See also Sharpe, 432 Mass. at 612 (generally when "there has already been extensive media coverage of the individuals and events at issue," and "the subject matter of publicity is of legitimate public concern," release of court records does not constitute invasion of privacy).  Given the limited nature of the discussions concerning the mother at the hearings, her interests are adequately protected by redactions of information not already publicly available.[20],[21]
            We next consider the remaining Rule 7(b) factors –- (iii) the extent of community interests, (iv) constitutional rights, and (v) the reasons for the request -- together.  The extent of community interest in this case could not be overstated.  The child has died at the hands of the father, to whom custody was given at the February 2019 hearings.  See, e.g. M.C. II, 483 Mass. at 451 (recognizing strong community interest where parents were charged with inflicting serious bodily injury on child).  In the years since the child's disappearance, this case has precipitated dozens of news articles and an investigation and public report by the OCA.[22]
            The journalist asserts that the reason for his request is to use the audio recordings of the custody hearings in connection with a documentary concerning the child welfare system.  Releasing these recordings to the journalist for purposes of the documentary he proposes may help to better inform the public both about what happened to this child specifically and whether there are steps the child welfare system generally can take to minimize the possibility of repeating this tragedy.  Cf. Sharpe, 432 Mass. at 607 (public access to affidavits in support of domestic abuse protective orders helps public "evaluate why an order may or may not have been successful in protecting a victim of domestic violence").  See generally Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 572-573 (1980) (recognizing press's role "functioning as surrogates for the public" in acquiring information concerning court proceedings); Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 559-560 (1976) (free and "responsible press" has long been recognized as "the handmaiden of effective judicial administration," helping to "guard[] against the miscarriage of justice by subjecting . . . judicial processes to extensive public scrutiny and criticism" [citation omitted]).[23]
            Finally, the second judge considered the journalist's request in view of one additional factor:  a Juvenile Court standing order that limits the uses of court proceeding recordings.[24]  The standing order, however, cannot alter the demonstrated good cause for the release of audio recordings of the February 2019 hearings to the journalist for use in his documentary.  Here, a professional journalist[25] is seeking access to recordings of court hearings "to educate the public about [the child welfare and foster care] systems."
            3.  Conclusion.  Based on our careful review of the relevant recordings, and for the reasons described supra, we conclude that the journalist has demonstrated good cause for access to the recordings of the requested February 2019 hearings for use in a documentary.
            Before the recordings are released to the journalist, however, the names of the father's other children must be redacted, as must the name of the mother's other child.  These children are named approximately twenty-eight seconds into the recording of the first session on February 8, 2019; and, during the recording of the second session on February 8, 2019, at approximately 11:02-11:03, 11:04, 11:06, 37:42-37:45, and 48:08-48:09.
            In addition, in light of the statutory impoundment of care and protection proceedings, we agree with the journalist that the following conditions are apt.  First, the redacted recordings shall be released to the journalist; he may not release them further until the documentary in which they are included is released.  Second, even after the release of the documentary, the journalist may not release any portion of the redacted recordings other than those portions actually published in the documentary.
            We vacate the order denying the motion for access to court recorded audio, and we remand the matter to the Juvenile Court for entry of an order allowing the court recorded audio of the two February 2019 hearings to be released to the journalist for the limited purpose of their use in a specified documentary and subject to the redactions and the conditions we have identified in this opinion.
So ordered.
 
footnotes

 
            [1] A pseudonym.
            [2] The OCA is an independent agency empowered to, inter alia, "investigate and ensure that the highest quality of services and supports are provided to safeguard the health, safety and well-being of all children receiving services" from the Commonwealth.  G. L. c. 18C, § 2.
            [3] The names of the child's three siblings, identified at approximately twenty-eight seconds into the recording of the first session on February 8, 2019; and, in the recording of the second session on February 8, 2019, at approximately 11:02-11:03, 11:04, 11:06, 37:42-37:45, and 48:08-48:09, are to be redacted from the released recordings.
            [4] We acknowledge the amicus briefs in support of the journalist submitted by the Reporters Committee for Freedom of the Press and other media organizations, and by the Honorable Jay D. Blitzman.
            [5] The judge granted custody to the department until the child became "an adult or until, in the opinion of the department, the objective of [the] commitment has been accomplished, whichever occurs first."  G. L. c. 119, § 26 (b).  See note 9, infra.
            [6] In total, the mother had physical custody of the child for approximately fifteen months during the child's first five years of life.  Office of the Child Advocate, at 14, 17, 19, 91.
            [7] In September 2015, the father had been released from prison.  Office of the Child Advocate, at 16.
            [8] The father's girlfriend and later wife also attended the supervised visits between 2017 and 2019.  The department's records do not indicate whether she and the child ever interacted.  Office of the Child Advocate, at 17, 19-20, 30.
            [9] Unless the Juvenile Court also terminates the parents' parental rights, a "permanent" custody order is subject to "review and redetermination" at the request of, among others, a parent or the department at six-month intervals.  See G. L. c. 119, § 26 (c); Care & Protection of Jaylen, 493 Mass. 798, 806 (2024).  "This provision is 'primarily, the means by which a parent or other interested party, including the department, may bring to a judge's attention a change in the situation of a child, or of a child's parent, which might warrant reconsideration or modification of the original order adjudicating the child in need of care and protection.'"  Care & Protection of Jaylen, supra, citing Adoption of Helen, 429 Mass. 856, 861 (1999).
            [10] In April 2018, three months after the child was again removed from her physical custody, the mother requested a review and redetermination hearing seeking legal custody of the child.  Office of the Child Advocate, at 19.  That hearing was scheduled for February 2019, and the father's hearing was subsequently scheduled for the same day.  Id.
            [11] A "home study" is "[t]he comprehensive assessment process and the written summary and conclusion thereof used to evaluate the suitability of individuals or couples to [obtain custody of] a child.  A home study assessment includes, but is not limited to, evaluation of the applicant's parenting abilities, medical, criminal, and employment histories and financial status, and inspection of his or her residence."  606 Code Mass. Regs. § 5.02 (2018).  See New Hampshire Division for Children, Youth and Families Policy Manual, Policy No. 1584 (2019) ("Home Study" is "an evaluation of a home environment conducted by [New Hampshire] at the request of another state to determine whether a proposed placement of a child/youth would meet the individual needs of the child/youth, including the child/youth’s need for safety, permanency, health, and well-being, as well as provide the necessary supports for their mental, emotional, and physical development").
            [12] The ICPC is an agreement adopted by all fifty States, the District of Columbia, and the Virgin Islands to govern the placement of children over jurisdictional borders.  Its purpose is, inter alia, to ensure that the Juvenile Court and child welfare agency of a jurisdiction considering placing a child in another jurisdiction "may obtain the most complete information on the basis of which to evaluate a projected placement before it is made," and to promote "appropriate jurisdictional arrangements for the care of children."  G. L. c. 119 App., § 21, inserted by St. 1963, c. 452, § 1.  To that end, the ICPC "provides that the department may not send [a child] in its custody to another State until the appropriate public authorities in the receiving State notify the department in writing that the proposed placement does not appear to be contrary to the interests of" the child.  Adoption of Willow, 433 Mass. 636, 638 n.3 (2001), citing St. 1963, c. 452, § 1.
            The ICPC establishes mandatory procedures when a child is placed across State borders "in foster care or as a preliminary to a possible adoption."  G. L. c. 119 App., § 2-1.  The department's regulations also require an ICPC home study report when a child is placed "with a previously non-custodial parent" in another State.  110 Code Mass. Regs. § 7.507(2) (2008).  See Adoption of Knox, 102 Mass. App. Ct. 84, 89-91 (2023) (ICPC "provides a floor of protection, not a ceiling" and its application "to the placement of a child with an out-of-State, noncustodial parent" is appropriate when "necessary to serve the protective ends that the ICPC and other child welfare statutes were designed to foster"); 110 Code Mass. Regs. § 7.503(8) (2008).
            [13] The ICPC calls for the appointment of an administrator who "shall be general coordinator of activities under this compact in his jurisdiction and who, acting jointly with like officers of other party jurisdictions, shall have power to promulgate rules and regulations to carry out more effectively the terms and provisions of this compact."  N.H. Rev. Stat. Ann. § 170-A:1, art. VII.
            [14] Specifically, in response to the father's motion to dismiss the child's care and protection case upon a finding of fitness, the department raised the concern that, following dismissal of a care and protection proceeding, the mother of a nonmarital child generally assumes custody until the Probate and Family Court grants custody to another person.  Office of the Child Advocate, at 51-52.  See Care & Protection of Jaylen, 493 Mass. at 807 (keeping care and protection proceeding open permissible to allow father of nonmarital child to obtain custody order from Probate and Family Court).
            [15] To effectuate this legislative determination, Juvenile Court Standing Order 1-84 (1984) provides:
"All [J]uvenile [C]ourt case records and reports are confidential and are the property of the court.  Reports loaned to or copied for attorneys of record, or such other persons as the court may permit, shall be returned to the court after their use or at the conclusion of the litigation, whichever occurs first.
"Said reports shall not be further copied or released without permission of the court."
See Care & Protection of Sharlene, 445 Mass. 756, 772 (2006) ("If [Juvenile Court] hearings are closed, pursuant to G. L. c. 119, § 38, in order to protect the confidentiality of the parties, yet the relevant documents remain unsealed, there is no way to protect the confidentiality of the parties, the purpose for which the statute was designed").
            [16] Pertinent here, G. L. c. 119, § 38, provides that all hearings in care and protection proceedings "shall be closed to the general public.  It shall be unlawful to publish the names of persons before the court in any closed hearing."
            [17] Although no privacy interest has been marshaled on behalf of the father's other children, their names -- like the name of the mother's other child identified in the recordings -- must be redacted before the recordings are released.  See note 20, infra.
            [18] The second judge stated that the child's "right to privacy must be considered," but she made no findings as to the privacy the child maintains in the February 2019 recordings in light of the extensive information about her care and protection proceedings and other personal details that have already been disclosed to the public.  Having listened to the recordings at issue, we conclude that their release for the journalist's limited use, subject to the redactions and conditions we discuss herein, would not inflict any further indignity.
            [19] Although the department was a party to the proceedings, it rightly does not assert any privacy interest of its own.
            [20] The only such information we discern from the recordings is the name of another of the mother's children, which must be redacted before the recordings are released.  See note 17, supra.
            [21] The second judge incorrectly considered the journalist an "uninterested party."  We conclude that he is an "interested nonparty" for purposes of the care and protection proceedings, which the URIP defines as, inter alia, "a person who is not or was not a party to the underlying matter in which an impoundment issue has arisen, but who nevertheless expresses to the court (through a motion, an appearance limited to impoundment, filing, or otherwise) an interest in the impoundment proceeding."  Rule 1(b)(11) of the Uniform Rules on Impoundment Procedure (2015).  The URIP drafting committee's notes provide that "a media representative might seek to contest the entry of an impoundment order.  [The URIP] grant[] standing to such an interested nonparty to request a hearing on the issue."  Massachusetts Impoundment Procedure Rules and Handbook 20 (2015).
            [22] The department maintains that the OCA report is not relevant to the good cause analysis, and the mother asserts that the OCA report was not in the record.  However, the journalist relied on the OCA report below, the second judge stated her familiarity with it, and it is directly relevant to our consideration of the privacy interests involved and the extent of community interest.
            [23] The journalist also asserts a constitutional right of access to the requested recordings.  The ordinary test for determining whether there exists a constitutional right of access to a particular judicial proceeding is one of "'experience' and 'logic,'" and which involves considering whether the type of proceeding has "a historic tradition of openness."  Eagle-Tribune Publ. Co. v. Clerk-Magistrate of the Lawrence Div. of the Dist. Court Dep't, 448 Mass. 647, 651-652 (2007), quoting Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 9 (1986).  There is no "historic tradition of openness" in care and protection proceedings.  See M.C. I, 479 Mass. at 254 n.4 ("the presumption of the public's right of access is reversed in care and protection proceedings"); Care & Protection of Sharlene, 445 Mass. at 772-773 ("our cases that recognize a common-law right of access to the records of judicial proceedings" have "not involve[d] Juvenile Court records, which, by law, are confidential").  We need not determine what, if any, constitutional rights to Juvenile Court records exist in the present circumstances, because we conclude that the release of the otherwise impounded audio recordings of the February 2019 custody hearings to the journalist is appropriate in this case.  Cf. Trustees of Boston Univ. v. Clerk-Magistrate of the Cambridge Div. of the Dist. Court Dep't, 495 Mass. 56, 64 (2024) ("while members of the public are not entitled to attend show cause hearings, we have recognized that 'there may be circumstances in which an open hearing is appropriate'" [citation omitted]).
            [24] Standing Order 2-09 identifies "[i]mpermissible [u]ses" of sound recordings of Juvenile Court proceedings and states, inter alia, "No sound recording copy shall be used for a commercial purpose, for public or private entertainment or amusement, or for any other purpose detrimental to the administration of justice."  Juvenile Court Standing Order 209(B)(6) (2009).
            [25] The second judge stated that the journalist previously published "incorrect," "inaccurate," and "misleading" information concerning the child's care and protection case.  "[E]rroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive'" (citation omitted).  New York Times Co. v. Sullivan, 376 U.S. 254, 271-272 (1964).